Robert A. REED, et al., Plaintiffs,

v.

James A. RHODES, et al., Defendants.

No. 1:73 CV 1300.

United States District Court,
N.D. Ohio,
Eastern Division.

May 8, 1996.

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, Ohio, David W. Whitaker, Beachwood, Ohio, for Plaintiffs.

Wanda Rembert Arnold, Cleveland Board of Education, Law Department, Cleveland, Ohio, for Local Defendants.

Stephen M. O'Bryan, Margaret Anne Cannon, Kelley, McCann & Livingston, Cleveland, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State Defendants.

### ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

On August 31, 1976, after a lengthy trial, the late Judge Frank J. Battisti of this Court

concluded that from the 1950s through the 1970s, students in the Cleveland Public Schools were increasingly segregated by race through the intentional conduct of the State and Local Defendants. *Reed v. Rhodes*, 607 F.2d 714, 723 (6th Cir.1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980).

On February 6, 1978 Judge Battisti reaffirmed his earlier conclusion that "defendants (City [Cleveland School District] and State [Ohio State Board of Education and its Superintendent of Instruction]) ... discriminate[d] against plaintiffs by numerous acts and omissions, the purpose and effect of which were to foster and maintain a segregated dual school system; and that these numerous constitutional violations had systemwide impact entitling plaintiffs to a systemwide remedy[,]" *Reed v. Rhodes*, 455 F.Supp. 546, 550 (N.D.Oh.1978), and that both the City and State Defendants are constitutionally liable for having maintained a *de jure* segregated public school system, *id.* at 568, in sum, *A STATE–IMPOSED DE· JURE SEGREGATED PUBLIC SCHOOL SYSTEM.*

The Remedial Order continued that "[f]indings of systemwide *de jure* segregation mandate a comprehensive, systemwide plan of actual desegregation which *ELIMINATES THE SYSTEMATIC PATTERN OF SCHOOLS SUBSTANTIALLY DISPROPORTIONATE IN THEIR RACIAL COMPOSITION TO THE MAXIMUM EXTENT FEASIBLE.*" *Id.* at 568. (Emphasis added). *See also Reed v. Rhodes*, 662 F.2d 1219 (6th Cir.1981), *cert. denied sub nom. Ohio St. Bd. of Educ. v. Reed*, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982) (affirming state liability). (Emphasis added).

Judge Battisti issued exhaustive Instructions and Guidelines and implemented an elaborate procedure to develop what ultimately· became his Remedial Order dated February 6, 1978 (Seminal Order). The Court's efforts embraced the appointment of a Special Master and two sociological desegregation experts. The Special Master initiated protracted hearings which included testimony from six Cleveland Board of Education administrative personnel, five Cleveland board members, and three State Board of Education employees.· Members of the general public were invited to present testimony and recommendations· before the Special Master. The hearings entertained forty-one representatives from community civic organizations, a representative of the Cleveland Teachers Union, and five private individuals.· In addition, voluminous written responses incorporating supplemental advice and proposals were entered into the record at those hearings. Information developed during the course of the hearings, including additional comments and suggestions from concerned citizens of the city and data submitted by the Cleveland Schools superintendent, were considered in fashioning the final Remedial Order which became the seminal document that charted the course to be implemented by the State and Local Defendants ·for a period that has now exceeded some eighteen years.

The Remedial Order of February 6, 1978 that evolved from arduous community participation defined with particularity the following compliance requirements:

1. desegregation of administrative and ·certified supervisory and teaching personnel; and

2. desegregation of non-certified personnel; and

3. desegregation of school facilities— buildings and classroom enrollment resulting from student assignment practices; and

4. development of creative educational curriculums, including innovative reading and other programs designed to correct · the effects of prior segregated schooling as is reasonably possible; and

5. other ancillary adjunct relief calculated to (1) remedy the academic effects of prior segregation, (2) ensure that existing and future programs are administered in a non-discriminatory fashion, (3) maintain a secure, integrated school environment in which the rights of all students are protected, and (4) guarantee that court-ordered educational provisions are successfully implemented by:

   (a) testing and tracking

(b) counseling and career guidance

(c) magnet school programs

(d) cooperation with universities, and business and cultural institutions

(e) extracurricular activities

(f) staff development and student training in human relations

(g) student rights

(h) school community relations

(i) safety and security

(j) management capability and financial integrity

to dismantle the existing segregated dual school system that had been imposed by the State and Local Defendants as necessary to achieve total unitary desegregated status of that system.

In his February 6, 1978 Order, Judge Battisti announced that the Defendants' progress and/or success in purging the local school system of *STATE–IMPOSED SEGREGATION* would be measured against an intractable mathematical formulation: "[a] fifteen percent deviation from the percent ratio of the district [population] as a whole is the maximum deviation that would be reasonable." *See Reed v. Rhodes,* 472 F.Supp. 615, 617 (N.D.Oh.1979). Given the then existing geographic residential demographics of the City of Cleveland, the Court suggested that the Defendants "employ [the] techniques of contiguous and noncontiguous pairing and clusterings, boundary changes, grade structure changes, and feeder pattern changes, to effectuate the designation of the Cleveland public school district[,]" as recommended in *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). *Reed v. Rhodes,* 455 F.Supp. 569, 573 (N.D.Oh.1978).

In his Remedial Order, *id.* at 571–72. Judge Battisti recognized and adopted the Supreme Court's admonition in *Brown v. Board of Education ("Brown II"),* 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) that:

School authorities have primary responsibility for elucidating, assessing, and solving these problems[.]

The role delegated to the courts pursuant to *Brown II* was to

consider whether the action of school authorities constitutes *GOOD FAITH IMPLEMENTATION OF THE GOVERNING CONSTITUTIONAL PRINCIPLES.*

*Id.* (Emphasis added).

The Supreme Court has consistently cautioned that:

the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution

and that federal-court decrees must directly address and relate to the constitutional violation itself. *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995), *citing Milliken v. Bradley (Milliken II),* 433 U.S. 267, 280–82, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977).

Heeding the dictates of the Supreme Court, this Court reiterated that issues of fiscal stability and managerial effectiveness of a local school system were concerns of the Court only to the extent that they impacted the ability of the local school authorities to implement the Court's desegregation remedial orders.

Responding to that pronounced direction, this Court, in its March 3, 1995 order[1] declared:

---

1. The record discloses that during the three and one-half years immediately preceding the March 3, 1995 order (Appendix A) directing the intervention of the defendant State Board of Education to assume the administration of the Cleveland School System, it had been totally decimated by the politicized fiscal and administrative mismanagement of a "reform" Cleveland Board of Education that was influenced by City of Cleveland political interferences. This board escalated a relatively manageable annual roll-over indebtedness of approximately $35 million

into an unprecedented, irreversible indebtedness of $140 million or more, virtually destroying its credit rating and fiscal credibility with the State of Ohio Board of Control and financial institutions. The Board also engaged in a pattern of deficit spending exceeding $70 million annually and was, on the above date, insolvent and facing a $30 million shortfall required to meet its daily operating expenses and salary commitments until June 30, 1995, the end of its fiscal year. The Cleveland School System was financially bankrupt, without fiscal and administrative accounta-

Hopefully, the Board, the District and the entire community is prepared to recognize the existing realities of the crisis confronting the Cleveland school system and the need for immediate, decisive, and perhaps unpopular action required to eliminate all vestiges of [discrimination] and expediently *return the control of the schools to local authorities without judicial supervision at the earliest practicable date, thereby making the board accountable to the citizenry and the political elective process of the Cleveland School District.*

Order of March 3, 1995, at 1560–1561. (Emphasis added).

Prior to 1992, the Defendants had been methodically and successfully addressing compliance with the components of desegregation identified in that February 6, 1978 seminal order and its progeny with a view toward achieving total unitary status and the return of the local Cleveland School District to the control of local authority without judicial supervision at the earliest practicable date, thereby making its administrative supervisory authorities accountable to the citizenry and the political elective process of that District.

In fact, after the District achieved a succession of substantive successes along its route to total desegregation, Dr. Gordon Foster, the parties' joint desegregation expert, declared in his 1988 report entitled "A Study of Desegregated Student Assignments in the Cleveland Public Schools" that

Before the [court-ordered assignment] plan, 88 percent of all students attended one-race schools; *after implementation, every school was desegregated.* The District is now racially stabilized at 70 percent Black. *It is the only majority Black, large city system in the country which is totally desegregated.*

Foster Report, Introduction, at i–ii. (Emphasis added).

His opinion was supported by reports of the Office on School Monitoring and Community Relations (OSMCR) generated in July of 1991 (*See* page 15, paragraph # 3). (SDX–DD, p. V–1–II Tab 30; T. 24–25).

The systematic, successful compliance efforts of the defendants were substantially disrupted, however, by disastrous outside political interferences into the internal affairs of the School District from 1992 until the court-ordered intervention of the State Board of Education and its Superintendent of Public Education.[2] During the interim period after the inauguration of the politically dominated "reform" Cleveland Board of Education, Dr. Sammie Campbell Parrish, a respected creative educator, who was the Superintendent of the Cleveland School District, introduced an innovative educational program styled "Vision 21." Vision 21 was acclaimed as highly progressive and designed to satisfy component nos. 4 and 5 of Judge Battisti's compliance requirements, *i.e.* develop creative educational curriculums in reading and other programs designed to correct the effects of prior segregated schooling as was reasonably possible. It was calculated to instill and develop pride, self esteem, and learning, and to implement other initiatives. Her charismatic public appearances in promoting Vision 21 endeared her to parents, students, faculty, and the entire Cleveland population. The substance of Vision 21 and its universal acceptance by the Cleveland populace prompted the adversary parties to this action to incorporate it, without modification, as a keystone of the Consent Decree of May 25, 1994. Unfortunately, the momentum generated by the initial implementation of Vision 21, coupled with the high profile public image and popularity of Dr. Parrish that overshadowed the less than impressive performances of the local Board of Education and its politically motivated mentors, caused friction and underlying personality conflicts which appeared to have precipitated a series of orchestrated public confrontations calculated to encourage the ultimate resignation and departure of Dr. Parrish, her Deputy Superintendent of Educational Services, and her Deputy Adminis-

---

bility or direction, and incapable of implementing the Court's extant remedial orders.

**2.** *See* Footnote 1, *supra.*

trator of Support Services, all to the detriment of the School District.[3]

The effects of the public confrontations were profound. The Cleveland School District suffered total fiscal and administrative collapse when Dr. Parrish resigned, virtually without notice, citing among other reasons, the "highly publicized falling-out with Mayor Michael R. White" (Patrice M. Jones and Scott Stevens, *Parrish Quits to Return to North Carolina,* **The Plain Dealer,** Feb. 17, 1995 at 1A), and subsequently departed from Cleveland on March 3, 1995, the date that the State Board of Education and its Superintendent of Instruction were, by this Court, directed to assume complete administrative and operational control of the District pursuant to its delegated state constitutional and statutory authority and restore the System's integrity, operational control, and capability to resume implementation of this Court's orders without interference from the local Board of Education.

Within days of this Court's March 3, 1995 Order, Dr. John Theodore (Ted) Sanders,[4] the then State of Ohio Superintendent of Public Instruction, began the implementation of a viable contingency plan designed to immediately restore an uninterrupted interim fiscal and operational administrative capability required to alleviate the emergency confronting the Cleveland School District.[5]

---

3. On November 8, 1994, after Cleveland voters, for the second time during that year (the first occurring on May 23, 1994), had expressed a lack of confidence in the three-year performance of the "reform" Board of Education by rejecting a well-financed 9 mill school operating levy by a 3 to 2 disapproval vote, the underlying disruptive political intrusions into the educational and administrative responsibilities of Dr. Parrish became more pronounced.

The mayor publicly implied that Dr. Parrish and her administrators lacked assertiveness, were inattentive to their management responsibilities, and were not aggressive in reforming the school system. He opined that "the public had the perception that school officials were not driving reform of the system.... 'It's time to break glass.'" **The Plain Dealer,** November 17, 1994 at 1A.

Parrish charged the mayor and the board with political interference with her duties, disrupting the operation of the entire school system in an effort to discredit her. She asserted that she spoke out about her exclusion from the closed-door meeting because she felt that she had been "painted into a corner." **The Plain Dealer,** November 18, 1994 at 1A. She went on to say that:

"Obviously there is a political meeting going on [the closed-door mayor-board session of November 16, 1994] because if it was an educational meeting, I should be there."

The mayor's actions "make it seem as if he was waiting in the wings for the levy to fail so he could come out with these statements."

Parrish stated that she had "one luxury the mayor and the other elected officials on this board don't have. I don't have to do things for political gain, for ego or for longevity.... I can do what's right, and I will continue to do that."

Characterizing the mayor's statement regarding 'breaking glass', Parrish said "[It] sounds a little bit like doing something for public relations.... I won't do that."

"The mayor is a good person, but I am beginning to believe that I overestimated his understanding of education reform."

(All of the foregoing quotes are from Patrice M. Jones and Scott Stevens, *Parrish Not Invited to Meeting on Schools,* **The Plain Dealer,** Nov. 17, 1994 at 1A.)

4. Dr. Sanders is a nationally recognized and respected educator with impeccable credentials and career achievements. During his 80–month Washington, D.C. experience in the United States Department of Education, he served as Under Secretary, Deputy Secretary, and Acting Secretary of Education, and had a key role in planning the first Education Summit in the nation's history. He participated in creating America 2000 strategy and formulating the National Education Goals. He had served as State Superintendent of Education in Illinois for four years. Dr. Sanders served as President of the Council of Chief State School Officers; President of the North Central Regional Education Laboratory; council member of Project 2061 of the American Association for the Advancement of Sciences; Vice President of the Executive Committee of the National Council for Accreditation of Teacher Education, etc.. He is presently the chancellor of Southern Illinois University, a post he assumed in July of 1995.

5. Dr. Sanders immediately assumed personal supervision of the System by his presence in the District. He provided executive state administrative staffing. He applied for, and received, State Board of Control approval to seek a required $30 million loan to fund daily operating and salary expenses of the System until June 30, 1995, the end of the District's fiscal year. He successfully negotiated a loan in that amount with two financial lending institutions. Within a month, he had convinced Dr. Richard A. Boyd, a highly-respected educator with flawless national credentials, who had served as the Superintendent of the Warren, Ohio School District before

Despite critical commentary and resistance from the self same political and allied sources whose self-serving personal agendas and interests caused the System's catastrophic predicament, State Superintendents of Instruction Drs. Ted Sanders, John M. Goff,[6] and Richard A. Boyd have, within a relatively short time frame, stabilized the financial and management integrity of the System; and with the assistance of the McKinsey Group, financial management consultants, they have developed an interim and long-range plan styled "A Blue Print to Improve Student Performance and Achieve Financial Stability" calculated to revitalize the financial and management capabilities of the System and restore the confidence of the community in its operation.[7]

The factually unsupported critical rhetoric of self-promoting politicians and their collaborating commentators notwithstanding, the State Superintendents of Instruction have systematically initiated innumerable affirmative programs which have resulted in:

- The smoothest school opening in recent history in September, 1995, despite the closing of eleven schools, relocation of equipment, and reassignment of hundreds of staff and thousands of students;
- The realignment of curriculum to achieve consistency with proficiency test objectives;
- New achievement standards for each grade level;
- New programs designed to enhance math and science instruction (NSF–Urban Systemic Initiative);
- Faculty inservicing to improve upon proficiency strategies;

- More proficiency intervention with high school students;
- 224 personnel position eliminations, saving approximately $9.8 million for FY 1996, and other cost reductions amounting to additional savings of $2.2 million, aggregating $12 million annually;
- Medicaid reimbursement increases amounting to more than 300%;
- Reductions in legal fees which will save more than $500,000 in FY 1995–96;
- Monthly meetings concerning compliance with extant remedial orders involving the Plaintiffs and State and District personnel;
- A position control system;
- New agreements to maximize purchasing power and reduce costs, including participation in the Self–Help Gas Program, with estimated savings of $100,000 for the first year, and which will produce increased savings in subsequent years;
- Designated eleven schools and one administrative site for closing;
- Encouraged more and better technology services provided by loaned executives;
- Transportation savings of approximately $500,000 in FY 1995–96, with reinstatement of transportation for high school students residing more than 4 miles from school, and payment in lieu of transportation for non-public high school students;
- A Bruening Foundation grant to introduce a pilot program of video cameras on buses to enhance safety and monitor conduct;

becoming the Superintendent of Lakewood, Ohio's school system, subsequent to which he was the State Superintendent of Education for Mississippi, to take a leave of absence from his position as Executive Director of the Martha Holden Jennings Foundation, a prestigious philanthropic organization, to become the Deputy Superintendent of Public Instruction assigned to the day-to-day supervision of the administrative, fiscal, and educational reorganization of the Cleveland School District. He has been the President of the Southeastern Education Improvement Laboratory, and of the Buckeye Association of School Administrators, and he has served on the Executive Committee of Chief State School Officers, the Steering Committee of the

Education Priorities Committee, the Executive Committee of Southern Association of Colleges, etc..

6. Dr. John M. Goff, who was the Assistant State Superintendent of Public Instruction, succeeded Dr. Ted Sanders as State Superintendent of Public Instruction when Dr. Sanders became Chancellor of Southern Illinois University in July of 1995.

7. Both Drs. Goff and Boyd have pledged implementation of Vision 21 to the degree permitted by State allocated revenues and local community enhancements provided by local school operating levies.

· Comprehensive attendance sweeps to enforce the daytime curfew, District-wide random metal detector sweeps at all secondary schools, and evaluation of over 2,000 walking routes and 22,000 streets to identify potential hazards and safe walking paths to elementary schools;

· A program to sell fifteen properties at public auction; and

· The Honeywell project with structured maintenance of heating systems which resulted in fewer major seasonal heating problems.

The Court is satisfied and finds that the effective administration of State Superintendents of Instruction Dr. Ted Sanders, Dr. John M. Goff, and State Deputy Superintendent of Instruction Dr. Richard A. Boyd, while acting without interference from local politicians, has materially stabilized and restored some semblance of financial and management integrity to the internal affairs of the Cleveland School District and its vitiated credibility. Moreover, Dr. Boyd's implementation of "A Blue Print to Improve Student Performance and Achieve Financial Stability," if supported by local community operating levy initiatives, ensures a long-range orderly financial management, and above all, a high level of educational responsibility and accountability within the school system.

In this milieu of renewed stability, the Court turns to resolution of the substance of defendants' motion. The threshold determination confronting the Court in resolving the pending motion is the impact, if any, of the Supreme Court's pronouncements in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) upon sections 5 and 6 of a court-approved Settlement Agreement (Consent Decree) between the parties to this instant action dated May 25, 1995. In these sections it was agreed that students in the Cleveland Public Schools would be assigned to school buildings so as to ensure a racially balanced enrollment which was within ±15% of the systemwide racial composition which is presently 70% African–American; *i.e.*, each school would have a racial composition between 55% and 85% African–American.

*Rufo, id.*, departed from the much-quoted *Swift* standard, which had required "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" as a predicate to modification of a consent decree. *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). *Rufo* directed:

Our decisions since *Swift* reinforce the conclusion that the "grievous wrong" language of *Swift* was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees. *Railway Employees* [*sic*] emphasized the need for flexibility in administering consent decrees, stating: "There is ... no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."

*Rufo*, 502 U.S. at 380, 112 S.Ct. at 758, *citing Railway Employees v. Wright*, 364 U.S. 642, 647–48, 81 S.Ct. 368, 371–72, 5 L.Ed.2d 349 (1961).

The Court went on to say in *Rufo* that:

The upsurge in institutional reform litigation since *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased. See, *e.g., Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119–1121 (CA3 1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980), in which modification of a consent decree was allowed in light of changes in circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered.

*Rufo*, 502 U.S. at 380–81, 112 S.Ct. at 758.

To properly address the joint motions presently before the Court and place the issue of student assignments in a proper context, a brief review of the District's ongo-

ing efforts to cope with facilities and classroom desegregation and the District's successful compliance efforts is appropriate. Following implementation of the initial court-ordered student assignment plan in 1981,[8] student populations in Cleveland public schools immediately became dramatically more integrated. By 1983, only 10 schools were outside of the ±15% mandate, and every school had a racial ratio within 22% of the district-wide average.

To ensure that the District remained in compliance with the ±15% limitation, the defendants developed a "Five–Year Facilities Utilization Plan" which was approved by the Court on December 9, 1985. It directed annual compliance reviews "to monitor and analyze the desegregated status of individual schools, and to plan student reassignments or other measures to maintain racial balance percentages within acceptable ranges." (*See* Facilities Utilization Plan's Annual Review for 1987, Appendix B, at 3).

These annual reports reflected the District's analysis of the racial balances within individual schools and identified three separate categories of "problem schools:" (1) schools deviating from the prescribed racial balance which were targeted for "early warning" corrections short of mandatory student reassignments, such as recruiting efforts; (2) schools deviating from the ±15% standard for more than one year which were targeted for possible reassignment changes; and (3) schools deviating from the ±15% standard for two consecutive years which were targeted for mandatory student reassignments the following year. For each problem school the District developed detailed corrective measures to achieve racial balance. The District also reviewed the effects of the previous year's student assignment changes on the racial balance of the problem schools. Six annual impact reports were submitted to the Court beginning in 1987 and ending in 1992, when this review process was terminated by agreement of the parties and with the Court's approval.

The Annual Review and the resultant regimented readjustments ensured a high level of compliance throughout the 1980s and into the early 1990s. During that period, noncompliance with the ±15% standard was limited to only 10–12 schools per year of the 130 within the system. This represented a compliance rate in excess of 90%.

The 90% compliance rate prompted Dr. Gordon Foster's comments in his 1988 report hereinbefore alluded to that "The (Cleveland School) District is now racially stabilized at 70 percent Black. *It is the only majority Black, large city system in the country which is totally desegregated.*" Foster Report, Introduction, at i–ii. (Emphasis added).

Dr. Foster's opinion and evaluation were confirmed and endorsed by a report issued by the Court's Office on School Monitoring and Community Relations (OSMCR) in July of 1991 wherein it advised that:

> Based on presently available information, it appears that defendants have complied in large part with the requirement that all schools have enrollments by race that reflect district-wide enrollment by race. While a relatively small proportion of District schools each year have enrollments that exceed the maximum deviation that would be reasonable (±15% from the District ratio), no evidence suggests that this is the result of discrimination on the basis of race in the assignment of students.

(SDX–DD, p. V–1–11, Tab 30; T. 24–25).

Because of this highly successful effort, Judge Battisti directed the parties to explore more flexible alternatives to the ±15% student assignment limitations:

> It should be clear that the Court did not set out to run a busing company. Transportation has been one of the tools for achieving desegregation. At the time it was ordered, it seemed to be one of the more effective means of doing so. The extent to which it is still necessary or desirable is a question that may be asked. In the course of asking though, it cannot

---

**8.** The initial assignment plan included (1) pairing and grouping of contiguous and noncontiguous residential zones; (2) optional majority (African-American) to minority (white) transfer provisions; and (3) the use of the ±15% parameter.

be emphasized enough that transportation must be considered in the larger context of education, and the means of improving educational outcomes.

*Reed v. Rhodes,* 1992 WL 80626 at *1, 1992 LEXIS 4723 at *3 (N.D.Oh.1992).

To assist the parties, Judge Battisti directed Drs. Foster and Joseph T. Darden to draft new student assignment procedures which provided greater flexibility in assigning students to school facilities.

Drs. Foster and Darden examined both short and long-term programs designed to improve educational offerings in a desegregated school system that favored parental choice. Phase One of the Plan which resulted embraced six elementary schools that would be exempted from the mandatory assignment program and would become "community schools" open to students living within a two-mile radius. Each of these schools was in a racially integrated neighborhood. The "community schools" would meet the ±15% requirement. Phase One objectives were calculated to maintain desegregation, improve student performance, reduce transportation, and move from involuntary assignments to a system of choice. Phase One was approved by the Court on August 5, 1992.

Phase Two identified a comprehensive education plan that was subsequently characterized as Vision 21. Vision 21 was devised to afford parents a preferred choice of student school assignments. Parents of elementary school children could elect either a magnet school or program or a community model school within their region. In the event a racially balanced community model school was not available in their region, parents could select a racially balanced similar school outside the region. Parents of children eligible for middle schools and high schools could elect enrollment in a district-wide magnet school, middle school, or high school in their region.

Pursuant to agreement between the parties and approval by the Court on July 21, 1993, a partial implementation of the Vision 21 program was commenced in the 1993–94 school year. The first year of implementing the program resulted in 41 schools exceeding the remedial order mandate of ±15%. Vi-

sion 21, which was calculated to eliminate extended and cross-town bus rides, provided for the three extreme corners of the District to be treated as stand-alone districts. The magnet school program was expanded, with new elementary schools added to serve as feeders for existing secondary school programs. Thus, under the program, parents were given the opportunity of enrollment choice in a magnet school situated anywhere within the District, a neighborhood community model school, or, absent a desegregated school within the region of choice, enrollment in an integrated school anywhere within the District.

Vision 21 was approved and adopted in its entirety without modifications or amendments and became the bedrock foundation of the negotiated court-approved Settlement Agreement (Appendix C) (hereinafter Consent Decree) *"INTENDED TO BRING Reed v. Rhodes TO AN ORDERLY AND JUST RESOLUTION."* It was obvious to the parties and the Court, during the protracted negotiations, that adoption of the Consent Decree and the implementation of Vision 21 would initially result in escalating the number of non-compliant school facilities that would fall outside the ±15% remedial order limitation and a re-emergence of racially identifiable schools with 90 percent or more African–American student enrollment. It was, however, contemplated that the two student-school assignment policies were nevertheless compatible and that available attractive alternative parental enrollment inducements would result in parental elections that would, within the two-year period imposed by section 6.3 of the Consent Decree, return all school-student enrollments to within relative ±15% compliance with the Remedial Order.

The parties and the Court anticipated that the good faith efforts of the State and Local Defendants could implement the student enrollment initiatives of Vision 21 while contemporaneously substantially satisfying the ±15% mandate in sections 5 and 6 of the Consent Decree. This is reflected by Judge Battisti's comments approving the Settlement Agreement with the realization that Vision 21 student enrollment policies were

predicated upon student-school assignment practices other than strict mathematical ratios:

In designing this educational plan, the District sought to increase substantially the opportunity for all students, particularly African–American students, to receive a high-quality education in a desegregated environment through the systematic upgrading of the general curriculum, *the creation of community model schools, a substantial broadening of the magnet school program based upon demonstrated demand, and the gradual implementation of a controlled-choice student assignment plan.*

Student-school assignment criteria was consciously evolved so as to provide parents, when given a choice, the opportunity to make considered elections that would eventually return each school to relative compliance with the ±15% parameters incorporated into the Consent Decree. To harmonize the desired results of eventually attaining a balance between ±15% student-school enrollment policies mandated by the seminal remedial order with Vision 21's broadly expanded parental student school enrollment choice, the District embarked upon an aggressive restructuring program. The Defendants provided for an increase in the number of magnet schools. They created community model schools, *i.e.,* Comer Model Schools, Afro-Centric/Multicultural Immersion Model Schools, Non-graded Schools, Outcomes–Based Education Schools, Family Center Schools, and Parent Teacher Cooperative Schools. They also took the following action: (1) guaranteed residential zones were created around the newly-created community model schools; (2) students in optional zones were reassigned to override choices in some instances; (3) students were transferred between Hicks and Dike Montessori Schools to achieve a more favorable distribution in both schools; (4) students in overcrowded middle schools, *i.e.* East Tech/South Middle School, were afforded transfer priority; (5) African–American students were reassigned from East Tech/South Middle School to Carl Shuler Middle School; (6) magnet schools were advertised to attract underrepresented races; (7) East Tech and Marshall Middle School regions were paired for assignment to community middle schools; and (8) residential feeder patterns were modified to improve racial balance in Carl Shuler Middle School.

Despite these efforts during the 1993–94 and 1994–95 school years, parental selections frustrated compliance with the ±15% criteria. The winds of change during the years immediately preceding these efforts revealed evolving reconsidered and revised community attitudes and parental priorities as reflected in a Citizens League survey released in 1993 (District Exhibit J, Hearing before the Special Master on 4/19/95–4/20/95). The report disclosed that 86% of African–American parents considered neighborhood student school enrollment "desirable" and that African–American parents within the Cleveland School District were more concerned about educational quality than racial balancing in schools; *i.e.,* 86% of African–Americans considered racially identifiable African–American schools acceptable so long as educational quality was comparable in all schools wherever geographically situated. In sum, parental choice, quality of education, and geographical proximity were significantly more important to African–American parents within the Cleveland School District than racial mix.

Thus, the record confirms that despite the initial optimism of the Court and the parties to harmonize the ±15% component in the Consent Decree with the implementation of the criteria of Vision 21 also incorporated into the Consent Decree, it became obvious that the intractable mathematical ratio of ±15% reflected in sections 5 and 6 was, and is, in conflict with the innovative community-supported initiatives of Vision 21. Experience dictates that the conflicting philosophies have become irreconcilable. Two years of implementing the student assignment provisions of Vision 21 have confirmed that the ±15% standard incorporated into sections 5 and 6 of the Consent Decree is outdated and cannot be balanced with the innovative concepts of Vision 21 of that decree.

In *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Supreme Court recognized that the value of a given practice designed to remedy past dis-

crimination may attenuate with the passage of time when it noted that:

> And with the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

*Id.,* 503 U.S. at 491–92, 112 S.Ct. at 1446.

Thus, the importance of outdated policies to impose strict racial balancing continues to diminish as the age of state-imposed or *de jure* segregation recedes further into the past.

Vision 21, which has received the enthusiastic support of the local community and has been endorsed by leading local scholars· and educators and provides a blueprint for educational improvement, is presently in its third year of implementation. Scrapping this well-respected and accepted initiative in favor of demonstrated ineffective student assignments anchored in strict mathematical ratios is contrary to the admonition of Justice Kennedy that "[r]acial balance is not to be achieved for its own sake." *Freeman,* 503 U.S. at 494, 112 S.Ct. at 1447.

Moreover, the parties and this Court have not been insensitive to the emerging community attitudes and priorities addressing the issue of student assignments. Their concerns were reflected in the Joint Stipulation of May 16, 1995 (Appendix D), which voluntarily abandoned, albeit for a one-year trial period, the ±15% formulation imposed 18 years ago by the remedial order in favor of the innovative initiatives of Vision 21 which reflect the community consensus and acceptance of parental choice student-school assignments.

To resolve the conflict between the dictates of the ±15% student assignment limitation imposed by the Seminal Remedial Order of August 6, 1978, as incorporated into sections 5 and 6 of the Consent Decree dated May 25, 1994, and disparate substantive provisions of Vision 21 advocating and ultimately according parents "open choice" in designating the school of attendance for their progeny, the Court seeks direction from *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

■ Under *Rufo,* modification of a consent decree may be warranted in any of the following factual circumstances:

> (1) "when changed factual conditions make compliance with the decree substantially more onerous";
>
> (2) "when a decree proves to be unworkable because of unforeseen obstacles"; or
>
> (3) "when enforcement of the decree without modification would be detrimental to the public interest."

*See id.,* 502 U.S. at 384, 112 S.Ct. at 760.

■ in its disposition, the Court recognized and rejected the notion that a modification should be allowed only when a change in facts is both "unforeseen and unforeseeable";

> Such a standard would provide even less flexibility than the exacting *Swift* test; we decline to adopt it. Litigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree.

*Id.*

■ If the moving party satisfies its burden, the Court should consider whether the proposed modification is suitably tailored to the changed circumstance.

■ The defendants have moved to modify sections 5 and 6 of the Consent Decree, and argued that changed circumstances render enforcement of the ±15% provision contrary to the public interest. Having reviewed the evidence developed during the trial of this cause and assigning appropriate weight to its credibility, the Court concludes for the reasons herein stated that, after two years of attempted implementation of Vision 21, the intractable mathematical ratio of ±15% reflected in sections 5 and 6 of the Consent Decree was, and is, inherently in conflict with the innovative community-supported initiatives of Vision 21. This realization represents a material factual change and unforeseen circumstance which compels the Court to conclude that "enforcement of the decree without the proposed modification would be detrimental to the public interest." *Rufo,* 502 U.S. at 384–385, 112 S.Ct. at 760.

■ *Rufo* instructs that once the Court has concluded that changed circumstances warrant a modification of a consent decree, it must determine if "the proposed modification is suitably tailored to the changed circumstances." However, in resolving this inquiry, it should not seek to rewrite the agreement between the parties. The Court should be ever mindful that a consent decree is a contractual resolution of a controversy voluntarily undertaken by the parties that has been elevated to the status of a final judgment which may be reopened only to the extent that equity requires. Its terms, conditions, responsibilities, and liabilities survive and extend beyond active judicial supervision of its seminal legal proceeding.

A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires. The court should not "turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition."

*Rufo,* 502 U.S. at 391–92, 112 S.Ct. at 764, *quoting Swift,* 286 U.S. at 116–117, 52 S.Ct. at 462.

Heeding this directive from *Rufo,* this Court finds that equity requires modifying the Consent Decree to relieve the Defendants from the provisions of sections 5 and 6, *i.e.,* the duty to maintain a racial balance in each school within 15% of the systemwide average. The Court stresses, however, that the remainder of the Consent Decree remains intact and its terms, conditions, responsibilities, and liabilities continue to bind the parties and are calculated to survive beyond the Court's supervision and control of the Cleveland School District. Accordingly, this Court concludes that the Defendants' Motion to Modify the Consent Decree is well

taken and is granted subject to the Court's hereinbefore imposed condition.

Having decided that the Consent Decree and Remedial Orders may be modified, the Court must next consider if the Defendants' proposal to terminate the Court's judicial supervision and control over student-school assignments and return that responsibility exclusively to school authorities in accordance with their best judgment is appropriate under *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), because (1) the State and Local Defendants have substantially complied in good faith with all student-school assignment criteria as directed by the Court's Remedial Orders and the Consent Decree, (2) the school authorities have eliminated all vestiges of student-school assignments within the Cleveland School District to the extent reasonably practicable, and (3) it has achieved unitary status in the assignment of students to the extent reasonably practicable.

■ As a point of departure in considering the Defendants' joint motion, the Court's attention is again directed to the limitation of its inquiry as defined by the Supreme Court in *Milliken v. Bradley (Milliken II),* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977):

"[F]ederal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation[.]"

*Id.,* 433 U.S. at 282, 97 S.Ct. at 2758.

The Court in *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 247–48, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991) ruled:

From the very first federal supervision of local school systems was intended as a temporary measure to remedy past discrimination. *Brown* considered the "complexities arising from the *transition* to a system of public education freed of racial discrimination" in holding that the imple-

mentation of desegregation was to proceed "with all deliberate speed." 349 U.S., at 299–301, 75 S.Ct., at 755–57 (emphasis added). *Green [v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] [ (1968) ] also spoke of the *"transition* to a unitary nonracial system of public education." 391 U.S., at 436, 88 S.Ct., at 1693 (emphasis added).

After declaring that judicial supervision of local school systems was not intended to operate into perpetuity, the Court in *Dowell* recognized that:

> Local control over education of children allows citizens to participate in decision-making, and *ALLOWS INNOVATION SO THAT SCHOOL PROGRAMS CAN FIT LOCAL NEEDS. Milliken v. Bradley,* 418 U.S. 717, 742, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973).... Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination. See *Milliken v. Bradley* [*Milliken II* ], 433 U.S., at 280–82, 97 S.Ct., at 2757–58." *Spangler v. Pasadena City Bd. of Education,* 611 F.2d [1239] at 1245, n. 5 [ (C.A.9 1979) ] (Kennedy, J., concurring).

*Dowell,* 498 U.S. at 248, 111 S.Ct. at 630. (Emphasis added).

■ *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), instructs that federal courts may relieve a school district from judicial supervision in incremental stages before full compliance with a remedial order has been achieved in every area of the school system's operation. The trial court may also determine that it will not order further remedies in areas where the school district is in compliance with its decrees. Under appropriate circumstances, the Court may return control to the school system in those areas where compliance has been achieved.

We hold that, in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations. While retaining jurisdiction over the case, the court may determine that it will not order further remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations.

*Freeman v. Pitts,* 503 U.S. at 490–91, 112 S.Ct. at 1445–46.

The Court also dictated:

> Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities. In *Dowell,* we emphasized that federal judicial supervision of local school systems was intended as a "temporary measure." 498 U.S., at [247], 111 S.Ct., at 636. Although this temporary measure has lasted decades, the ultimate objective has not changed—to return school districts to the control of the local authorities.

*Id.,* 503 U.S. at 489, 112 S.Ct. at 1445.

The Court further noted that:

> A court's discretion to order the incremental withdrawal of its supervision in a school desegregation case must be exercised in a manner consistent with the purposes and objectives of its equitable power. Among

the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the law and the constitution that were the predicate for judicial intervention in the first instance.

*Id.*, 503 U.S. at 491, 112 S.Ct. at 1446.

■ Thus, in exercising its discretion, the district court must consider the following factors:

(1) whether there has been full and satisfactory compliance with the [seminal remedial order] in those aspects of the system where supervision is to be withdrawn;

(2) whether retention of judicial control is necessary or practicable to achieve compliance with the [seminal remedial order] in other facets of the school system; and

(3) whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's [seminal remedial order] and to those provisions of law and the constitution that were the predicate for judicial intervention in the first instance.

*See id.*

■ The ultimate inquiry seeks to determine if "the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable." *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995) (internal brackets omitted).

To assist a trial court in determining if a local school district has achieved "full and satisfactory compliance" with the student assignment component of a seminal remedial order, the Supreme Court in *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971) cautioned:

Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

It reaffirmed its explanation in *Freeman:*

Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

503 U.S. at 495, 112 S.Ct. at 1448.

■ The facts in *Freeman,* wherein the Supreme Court found that the DeKalb County School System (DCSS) had "fully and satisfactorily complied" with the Student Assignment component of the remedial decree in that case, are analogous to those of the Cleveland School District.

DCSS, as the Cleveland School District, had experienced bi-polar residential segrega-

tion. At the time of its motion for partial unitary status, its demographic composition reflected:

(1) 47% of the students attending DCSS were black;

(2) 50% of the black students attended schools that were over 90% black;

(3) 62% of all black students attended schools that had more than 20% more blacks than the systemwide average;

(4) 27% of white students attended schools that were more than 90% white;

(5) 59% of the white students attended schools that had more than 20% more whites than the systemwide average;

(6) of the 22 DCSS high schools, five had student populations that were more than 90% black, while five other schools had student populations that were more than 80% white; and

(7) of the 74 elementary schools in DCSS, 18 are over 19% black, while 10 are over 90% white.

*Freeman,* 503 U.S. at 476–77, 112 S.Ct. at 1438.

After a review of the DCSS efforts to achieve compliance with the district court's remedial consent decree approved in 1969, and the demographic changes that had occurred within DeKalb County during the intervening 17 years, the Supreme Court affirmed the trial court's conclusion that:

[A]bsent massive bussing, which is not considered as a viable option by either the parties or this court, the magnet school program and the M-to-M [minority-to-majority] program, which the defendants voluntarily implemented and to which the defendants obviously are dedicated, are the most effective ways to deal with the effects on student attendance of the residential segregation existing in DeKalb County at this time.

*Id.,* 503 U.S. at 481, 112 S.Ct. at 1440–41.

The Supreme Court, in its ruling, continued:

The Court of Appeals was mistaken in ruling that our [decisions] require "awkward," "inconvenient" and "even bizarre" measures to achieve racial balance in stu-

dent assignments in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces.

*Id.,* 503 U.S. at 493, 112 S.Ct. at 1447.

The Court went on to hold:

That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

*Id.,* 503 U.S. at 494, 112 S.Ct. at 1447.

Concurring, Justice Blackmun, joined by Justices Stevens and O'Connor, stated that a school system's obligation to desegregate "does not always require the district court to order new, affirmative action simply because of racial imbalance in student assignment." *Id.,* 503 U.S. at 512, 112 S.Ct. at 1456 (Blackmun, J., concurring). A court should assess whether changes in student assignments are "necessary or practicable" to achieve compliance with the decree, and whether the district's conduct is a contributing cause of the racially identifiable schools. *Id.,* 503 U.S. at 512, 112 S.Ct. at 1456–57.

The imbalance of noncomplying schools within the DCSS exceeded by far the number of Cleveland schools that were outside of the ±15% parameters mandated by Judge Battisti's Remedial Order and Consent Decree in *Reed.* In each year since 1980, through and including the 1992–93 school year, only 10 to 15 school buildings exceeded the ±15% requirement. (District's Exhibit 22 to its 1/5/95 motion; OSMCR Report, July 1991, at V–1–8; OSMCR Second Suppl.Report, November 1993 at 72). In 1993–94, the first year of the four-year Vision 21 assignment plan, 41 (of 127) buildings exceeded the ±15% requirement. *Id.* In 1994–95, 31

schools fell outside the ±15% requirement, including the 11 schools exempted from compliance with this standard by Section 6.1. of the Consent Decree. *Id.*

Although 58 schools within the Cleveland system exceeded the ±15% limitation of the Consent Decree in the school year in 1995–96, the noncompliance was excused by paragraph 4 of the Joint Stipulation:

> Neither the implementation of the State's plan nor any incremental increase in the number of racially identifiable schools (meaning schools exceeding the ±15 percentage point parameters) occurring in the 1995–96 school year shall be deemed or treated as a Consent Decree violation or as evidence of lack of substantial compliance with the extant remedial orders or the Consent Decree.

The District's Exhibit 22 is attached hereto as Appendix E.

A direct comparison of the DCSS and the Cleveland School District reveals that from 1983 to 1991 the Cleveland School District achieved substantially greater student desegregation than the DCSS:

(1) 69–71% of the students attending the Cleveland School District were African–American (47% in DCSS)

(2) less than 3.1% of African–American students each year attended schools that were more than 90% African–American (50% of African–American students did so in the DCSS)

(3) less than 4.5% of African–American students each year attended schools that had greater than 20% more African–Americans than the systemwide average (62% did so in the DCSS)

(4) no white student attended a school which was more than 90% white (27% did so in the DCSS)

(5) no white students attended a school with greater than 20% more whites than the systemwide average (59% did so in the DCSS)

(6) of the 38–41 secondary schools in the Cleveland School District no greater than 1 each year ever had greater than 90% African–Americans and none ever had more than 90% white (in the DCSS' 22 high schools, 5 were at least 90% black and 5 were at least 80% white).

Even after the implementation of the student assignment practices of the Joint Stipulation of May 15, 1995, which relied almost exclusively on parental choice and not mathematical ratios, the figures for Cleveland reflected much greater student desegregation than that in the DCSS:

(1) only 29.34% of African–American students attended schools that were more than 90% African–American (DCSS: 50%)

(2) only 27.29% of African–American students each year attended schools that had greater than 20% more African–Americans than the systemwide average (62% did so in the DCSS)

(3) no white student attended a school which was more than 90% white (27% did so in the DCSS)

(4) no white students attended a school with greater than 20% more whites than the systemwide average (59% did so in the DCSS)

(5) of the 36 secondary schools in the Cleveland School District only 12 were 90% African–American and none had more than 90% white (in the DCSS' 22 high schools, 5 were at least 90% black and 5 were at least 80% white).

OSMCR Report, Cleveland City School District Racial Composition Data for 1983–1991 and Present School Year (1995–96), 4/19/1996 (Appendix F).

The Cleveland School District also implemented far more demanding compliance requirements than DCSS to override the demographics of the City of Cleveland. In addition to extensive student attendance, zone boundary changes and clustering, provision for minority-to-majority transfers, magnet schools, and community model schools, the District also implemented one of the nation's most extensive and arduous programs of mandatory student reassignments and transportation. The District reassigned students annually during this period to ensure that schools that had fallen

out of compliance due to population mobility within this District were returned to compliance with the ±15% requirement.

A comparison of the Cleveland School District's compliance with the student assignment component of the Remedial Order as incorporated into the Consent Decree with the history of compliance approved by the Supreme Court in *Freeman* compels the conclusion that the Cleveland District achieved "full and satisfactory" compliance with court-imposed requirements during the relevant periods. Moreover, the record of compliance in the Cleveland School District, notwithstanding the recent increase in the number of schools outside the ±15% parameters, compares well with other districts that have been totally relieved of judicial supervision.[9]

■ In considering a grant of incremental or total unitary status, the Court should accord particular attention to the school system's historic record of good faith compliance. A school system's good faith intention to eradicate a state-imposed segregated dual system of education is disclosed by its demonstrated historical good faith commitment to a constitutional course of action that reflects a consistent pattern of lawful conduct directed to eliminating earlier violations.

> In considering these factors a court should give particular attention to the school system's record of compliance. A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And with the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

*Freeman,* 503 U.S. at 491–92, 112 S.Ct. at 1446.

In sum, as expressed in *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 249–50, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991), during the final phases of a desegregation case:

> The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.

The Cleveland School District's good faith in complying with the seminal desegregation decree since it was entered, and with the Consent Decree, and its good faith in eliminating the vestiges of past state-imposed discrimination to the extent practicable, are demonstrated by judging the Defendants' accomplishments against the compliance requirements Judge Battisti defined with particularity in his February 26, 1978 Order as hereinbefore itemized.

The record of these proceedings discloses and the Court finds and therefore concludes that:

1. administrative and certified supervisory and teaching personnel have been desegregated to the extent practicable; and

2. non-certified personnel have been desegregated to the extent practicable; and

3. the Cleveland School District, as discussed herein, has, since 1983 to the present, pursued aggressive affirmative practices, including but not limited to, cross-town busing to desegregate school and classroom enrollment; and

4. as more fully herein discussed, a creative educational curriculum, including innovative reading and other programs and initiatives designed to correct, to the extent reasonably practicable, the effects of segregated schools have been introduced into the Cleveland School District in the form of the community-wide ac-

---

**9.** *See, e.g., Flax v. Potts,* 915 F.2d 155 (5th Cir. 1990) (unitary status declared where 14 of 98 schools had student populations over 80% black and the overall student population was only 36% black); *Ross v. Houston Indep. Sch. Dist.,* 699 F.2d 218 (5th Cir.1983) (unitary status declared where 57 of 226 schools had student populations greater than 90% one race); *Stell v. Board of Pub. Educ.,* 860 F.Supp. 1563 (S.D.Ga.1994) (unitary status declared where 11 out of 44 schools did not meet the goal of ± 20% from the district-wide majority/minority ratio).

claimed Vision 21, and implemented for at least two years by a totally integrated administrative and certified supervisory and teaching staff; and

5. to the extent practicable, substantial compliance with the other ancillary adjunct components of the seminal remedial order calculated to (1) remedy the academic effects of prior segregation, (2) ensure that existing and future programs and initiatives are administered in a non-discriminatory fashion, (3) maintain a secure, integrated school environment in which the rights of all students are protected, has been achieved by introducing and implementing—

(a) an effective, approved, and accurate testing and tracking program;

(b) an effective and approved counseling and career guidance program;

(c) an effective magnet school program;

(d) an effective program of cooperation with universities, and business and cultural institutions;

(e) an effective program encouraging and implementing non-discriminatory extracurricular activities;

(f) student training and staff development programs;

(g) an effective program for enhancing community relations;

(h) improved, effective safety and security programs;

(i) the March 5, 1995 court-ordered supervision and control of the local district by the State Board of Education and its Superintendent of Public Instruction intended to restore management capability and financial integrity to the Cleveland School District after it was eviscerated by politicized mismanagement of the now-departed "reform" board of education and its political and private collaborators.

Stipulated Findings as to Defendants' Compliance with Extant Remedial Orders in *Reed v. Rhodes,* OSMCR Reports 7/29/91 and 11/12/93.

Having complied to the extent practicable with the hereinbefore enumerated and discussed compliance requirements of this Court's Remedial Orders, this Court's future supervision and control of the Cleveland School District shall be confined and limited to only those remaining areas, if any, where full compliance has not been achieved and where racial imbalance, school composition, and its attendant effects are traceable, in a proximate way, to constitutional violations. *See Freeman,* 503 U.S. at 490–91, 112 S.Ct. at 1445–46; *Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1283–84.

The Defendants' record of compliance with this Court's various Remedial Orders stands as an unequivocal manifestation of their good faith efforts to desegregate the Cleveland School District. Defendants have created an innovative school system that has implemented a number of initiatives designed to develop self-esteem and enhance the academic potential of all students regardless of race. Many remedial programs are targeted in African–American schools. Programs have been implemented to involve parents and offset negative socioeconomic factors. If the Cleveland School District has failed in any way, it is not because the school system has been negligent in its duties. The record discloses that the City of Cleveland has historically been a residentially segregated bipolar community (African–American east of the Cuyahoga River and Caucasian west of the Cuyahoga River). The demographics of recent years have reflected rapid population shifts within the city that were not caused or attributable to the Cleveland School District. These demographic dynamics were inevitable as a result of suburbanization and socioeconomic conditions. No evidence has been developed in these proceedings to support a conclusion that the effect of the Cleveland School District's previous unconstitutional conduct may have contributed to the residential segregation of the community and/or the dynamics of population mobility.

The Supreme Court, this Court, and circuit courts throughout the nation that have addressed the issue of mathematically-calculated student-school assignments, have recognized that there is a high correlation between residential segregation and school segregation. Wilson & Taeuber, Residential and School Segregation: Some Tests of Their

Association, in Demography and Ethnic Groups 57–58 (F. Bean & W. Frisbie eds. 1978). Equally apparent is the conclusion that the effect of changing residential patterns upon the racial compositions of schools is predictable. *Freeman*, 503 U.S. at 495, 112 S.Ct. at 1448.

In this proceeding, while compliance with the original ±15% student-school standard mandated by the Remedial Order never achieved a level of total perfection in any given year, it was always 90% or better during the decade ending 1990. The District justly earned Dr. Gordon Foster's 1988 assessment that the Cleveland School District was the "only majority Black, large city system in the country which is totally desegregated."

Deviations from the standard in 1993 and 1994 were attributable to the implementation of Vision 21, an initiative in which the Court and all parties joined, and to the demographic changes which were attested to by Dr. Thomas E. Bier, Director of the Housing Policy Research Program at Cleveland State University, who testified as the Defendants' expert witness during this trial. Thus Plaintiffs' charge that the increasing number of emerging racially identifiable schools within the District reflects the defendants' lack of compliance with the Court's ±15% standard addressing student school assignments is misconceived as explained in *Freeman*. In that disposition, the Supreme Court, in considering circumstances where an original *de jure* violation was intertwined with the existing demographic forces, and where a causal relationship existed to a presently observable racial imbalance, said:

> As the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith.

*Freeman*, 503 U.S. at 496, 112 S.Ct. at 1448. In the instant case, even if School Board decisions decades ago contributed in some tangible way to residential segregation, as time passed, the legally cognizable effect of such actions have diminished rapidly.

*Freeman* went on to explain:

> Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.
>
> In one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation. And the law need not proceed on that premise.

*Id.*, 503 U.S. at 495–96, 112 S.Ct. at 1448.

In this case, as the *de jure* violation became more remote with the passage of 20 years of affirmative effort to desegregate the Cleveland School District, during which period demographic changes intervened, it became less likely that a current racial imbalance in the Cleveland School District remained as a vestige of the prior state-imposed segregated system. The causal link between current conditions and the prior constitutional violation in this action is even more attenuated when the school district, as in this case, has demonstrated its good faith

in dismantling a state-imposed dual system of education. *See Freeman.*

■ The Plaintiffs complain that releasing the Cleveland School District from judicial supervision over the student assignment component of the Remedial Orders and the Consent Decree would permit the Cleveland School District to implement parental choice student-school assignment, which would result in an increase in the number of racially identifiable schools. This conclusion is correct; however, as the Supreme Court observed as early as 1971, a school district is not required to annually readjust attendance zones to keep up with demographics. *Swann*, 402 U.S. at 31–32, 91 S.Ct. at 1284; *Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424, 436, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976) (concluding that a federal court actually *exceeded its remedial authority* by requiring annual readjustment of attendance zones.); *Freeman*, 503 U.S. at 493, 112 S.Ct. at 1447. Applying these principles to the intensely bi-polar residential segregation that exists in the City of Cleveland, this Court concludes that the Cleveland School District is not required to indefinitely reassign students annually and transport them across town in order to maintain an artificial racial balance in the schools simply because of the intractable residential segregation in Cleveland. Racial balance is not to be achieved for its own sake. Once the racial imbalance due to the *de jure* violation has been remedied, as in this proceeding, the school district is under no duty to remedy imbalance that is caused by demographic factors, even if the demographic factor involved is the persistence of residential segregation rather than an increase in residential segregation, as noted in *Swann*, 402 U.S. at 23, 91 S.Ct. at 1279:

> Our [the Court's] objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.

In sum, this Court finds that the Cleveland School District achieved "full and satisfactory compliance" with the student assignment provision of the Remedial Orders for a period from 1983 to the present and has demonstrated its good faith commitment to fulfilling all aspects of the Remedial Orders of this Court and to the Constitution. The emergence of racially identifiable schools in 1993 to the present is the product of agreements between the parties and/or orders of the Court, and the reappearance of racially identifiable schools in the foreseeable future, in the absence of proof that either school authorities or some other agency of the State has attempted to fix or alter demographic patterns to offset racial composition of the schools, will be attributable to demographic forces beyond the ability of the Court and the Cleveland School District to influence or control.

Plaintiffs have opposed the Defendants' joint motion by testimony from their expert witness Dr. Robert L. Green. He identified the excessively high student dropout rate, suspension rate, expulsion rate, absenteeism and low academic performance of African–American students (T635–637) as remaining vestiges of discrimination that will be exacerbated if defendants prevail and their motion to rescind the ±15% limitation mandate of the student assignment component in the Remedial Orders and the Consent Decree is granted.

Twenty years ago, during the liability phase of this case, as an expert witness for the Plaintiffs, Dr. Green advocated that racially balanced schools would improve the performance of African–American students. At the present trial, he conceded that his prediction may have been erroneous in Cleveland even though schools here have been racially balanced by court order since, at least the mid 1980s. (T. 662–663).[10]

---

**10.** During the same time frame (1993–94), the student daily absentee rate in grades 9 through 12 increased to 29% (from Cleveland Public Schools Report: "Attendance Rates 1989–90 through 1993–94"); the cohort student dropout rate in grades 10 through 12 rose to 35% (from District Periodic Status Report (PSR) Specification 2b); the 9th to 10th grade non-promotion rate was 42% of the total enrollment of those grades, which rate rose to 61% by the end of the

There was a parity gap in the performance of black and white children twenty years ago in Cleveland, ten years ago, and it remains to this day. Twenty years of transportation to achieve racial balance has not resulted in improved academic performance profiles (T. 663–665), thus supporting a conclusion that disparities in racial balance in a school building or a classroom is not a detriment of improved academic performance. (T. 668).

Moreover, the Supreme Court has concluded that demonstrated student academic proficiency is not a vestige of discrimination and should not be a criteria to be considered by a court in resolving issues addressing incremental or total unitary status.

> As all the parties agree that improved achievement on test scores is not necessarily required for the State to achieve partial unitary status as to the quality education programs, the District Court should sharply limit, if not dispense with, its reliance on this factor. Brief for Respondent KCMSD et al. 34–35; Brief for Respondent Jenkins et al. 26. Just as demographic changes independent of *de jure* segregation will affect the racial composition of student assignments, *Freeman, supra,* 503 U.S., at 494–495, 112 S.Ct., at 1447–1448, so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure in the re-

medial calculus. See *Spangler,* 427 U.S. at 434, 96 S.Ct., at 2703–2704; *Swann,* 402 U.S., at 22, 91 S.Ct., at 1279. Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own.

*Jenkins,* ── U.S. at ──, 115 S.Ct. at 2055–56.

As reflected in the various pronouncements of the Supreme Court, the Plaintiffs' factually unsupported conclusions to the contrary, escalating inner city minority student absenteeism, the dropout rate, suspension rate, expulsion rate, and low academic achievement are not attributable to the performance of the local school authorities under circumstances where there is no evidence of an existing nexus between those conditions and the demonstrated performance of a local school administration. After assigning greater credibility to the Defendants' witnesses, the Court concludes from the weight of the evidence developed during the trial of the Defendants' joint motion that the Plaintiffs' evidence, both direct and circumstantial, falls short of satisfying their burden to prove the existence of the required nexus.[11]

■ The Court finds that inner city minority student absenteeism, the dropout rate, suspension rate, expulsion rate, and low academic performance in the local Cleveland School District are socioeconomic conditions

1994–95 school year in June of 1995 (from Cleveland City School District 2A–Promotes/Nonpromotes Annual Report(s) for Academic Year(s) 1993–94 and 1994–95); the 10th to 11th grade non-promotion rate was approximately 32%, which rose to 38% by the end of the 1994–95 school year in June, 1995 (*id.*); the 11th to 12th grade non-promotion rate was approximately 26%, which non-promotion rate rose to 31% by the end of the following school year in 1995 (*id.*); and demonstrated student proficiency (predicated upon the results of the March, 1995 4th grade proficiency test) of Ohio large urban school districts reached the lowest level in the state (from Cleveland Public Schools Report: "Fourth Grade Proficiency Test Results", 6/28/95).

11. Plaintiffs also relied upon the testimony of Rhonda Eberhart (Eberhart) and Sammie Rashidah Abdul–Haqq (Haqq), professed class representatives appearing on behalf of the class. Cross-examination disclosed that Eberhart had moved from the City of Cleveland a year and a

half prior to the trial and her child was enrolled in the Beachwood School System. The Court was unable to determine if Haqq was expressing personal opinions or testifying as a class representative. The testimony of these two witnesses causes the Court some concern as to the continuing viability of an existing certifiable class in these proceedings. It appears that the class representatives have no officers, no definable organizational structure, and no regularly scheduled meetings or agendas. They have no recorded agendas of scheduled meetings, regular or otherwise, with the members they purport to represent. Although both Eberhart and Haqq agreed *to file with the Court minutes of meetings,* agendas, and other documentation memorializing the activities of the class and its representatives demonstrating the continuing viability of a certifiable class, no such documents have been filed. In light of the foregoing, a motion for recertification of the class appears to be appropriate.

of the type addressed by Supreme Court precedent that are beyond the sole control of the Court and the school authorities. The responsibility to address and correct these underlying sociological conditions that significantly undermine the Cleveland School District or any school system's administration regardless of that system's qualitative educational standards rests directly upon parents, students, and the inner city community. If students fail to attend classes, student training programs, and student remedial programs, common sense dictates that academic achievements suffer proportionately. If parents refuse to attend school community relations programs, school community councils, and other parent-oriented programs sponsored, organized and implemented by the school authorities to reduce existing absenteeism, the dropout rate, suspension rate, and expulsion rate, and to encourage student academic achievement, the efforts of the school administration in providing these initiatives is reduced to a costly futile effort. It is also the direct responsibility of the entire Cleveland city community, and its voters, to restore local school revenues that have been materially subverted by a systematic program of real estate abatements and reduced real property re-evaluations.[12]

■ In addressing the last criteria of *Freeman*, the Court must determine if continued judicial supervision of student-school assignments is necessary to achieve compliance with any remaining components of the Court's Remedial Orders and the Settlement Agreement–Consent Decree of May 25, 1994 existing between the parties.

As herein noted, the Settlement Agreement–Consent Decree was intended as a final resolution of this controversy that was commenced twenty years ago. Its purpose was to release the Cleveland School District from judicial supervision and control. The Court consented to and approved Section 17.1 of that agreement:

17.1 To the extent that any of the terms of this Agreement conflict with provisions of extant remedial orders, the Parties agree and propose to the Court that this Agreement take precedence.

In law, the document rises to the level of an enforceable agreement subject only to the imposed limitations of contract law as herein discussed. Its terms and conditions are binding until July 1, 2000, with or without continued judicial supervision and control of the Cleveland School District.

As reviewed herein, the record discloses that the Cleveland School District has, throughout the years, substantially complied with its court-imposed responsibilities to provide students of every race, color, ethnic origin, and religion, to the extent practicable, access to uniform qualitative education. The local school authorities have dismantled, to the extent practicable, the dual system of state imposed-segregated schools within the dictates of the Constitution and the edicts of the Court. Sensitized to the implications of state-imposed school segregation, and with an awareness of its responsibilities to citizens of all races impressed by twenty years of continuing litigation, present school authorities and their successors will now, and in the years to come, continue to administer the local school system in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and it is unlikely that any school authority will return to practices which prompted the initiation of this case.

The evidence during the trial of this cause, and a review of the entire record of this case from its commencement on December 12, 1973, also developed that the elements of the ten point plan approved by the Joint Stipulation will become increasingly difficult to satisfy in future years. (T. 52–53). Dr. Boyd testified that it will not be possible to guarantee *everyone* an assignment to a school within the ±15% limits because the number of such schools will decrease in the future as parental choice options are exercised and only because the racial parameters have been expanded. *Id.* It was possible to make that guarantee this year because a pool of 3,000

---

**12.** *Cleveland City School District Performance Audit*, § 3 Finance, Revenue and Debt pp. 7–9, March 15, 1996.

students was available for new assignments following the closing of eleven schools. *Id.*

Testimony also reflected that the present requirement that all schools be at least one-third African–American will impose an inequitable burden on some students in the future. Satisfying that requirement will necessitate the reassignment of about 700 pupils per year for racial balance purposes while all other students will enjoy freedom of choice. (T. 54–55).

School authorities testified that absent judicial supervision over pupil assignments, the State and District would implement a seven point program for assignments next fall. (T. 144–145, 182; SDX–RR, Tab 44). Available student elections would be subject only to the capacity of the school buildings and programs to which they apply and a rational system designed to accommodate student transportation to selected schools. (T. 184). The enumerated seven points of commitment are:

· Provide the opportunity to attend the schools and programs of the family's selection, including the opportunity to matriculate within racially integrated buildings at the child's grade and program level.

· Permit each child to remain in the school in which he or she is currently enrolled.

· Target magnet school enrollments at 70% minority and 30% other, but exclude no child from a magnet program because of racial quotas.

· Encourage, through a number of devices, representation of the major racial elements in each school so that each child feels like a member of a substantial community.

· Permit schools to exceed 90% African–American enrollments if they are the products of parental choice.

· Eliminate reassignments for racial balance.

· Meet constitutional minimum standards.

Defendants further ensured that staff assignments—teachers, administrators, custodians, and support staff—would continue to be made in accordance with the Consent Decree. (T. 185–186). Pupils would be assigned in a manner free of racially segregative intent. (T. 186).

In summarizing, the Court, upon the evidence developed during the trial and the results of the experimental program implemented by the Joint Stipulation of June 25, 1995, approves and therefore ORDERS that the Defendants' recommendations that projected future trends justify the elimination of elements of the current State Plan, as follows:

1. All schools need not be at least one-third African–American.

2. Each child need not be guaranteed an assignment to a school where pupil composition will be within 15 percentage points of the system's average.

3. Magnet school assignments need not be subject to the ±15% limitation.

The Court further looks with favor upon the State's proposed assignment criteria for the next year to:

1. Provide choices to each child which will include the opportunity to attend schools and programs of the family's selection, including the opportunity to attend racially integrated buildings, wherever situated, at the child's grade and programmatic level.

2. Permit each child to remain in the school which he or she currently attends.

3. Target enrollments in magnet programs at 70% minority and 30% other, but do not curtail enrollments to meet arithmetical quotas.

4. Encourage, through assignments and programmatic placements, representation of the major racial elements in each school, so that each child feels like a member of a substantial community.

5. Permit schools to exceed 90% African–American enrollments if they are the products of parental choice.

6. Eliminate mandatory reassignments for racial balance.

7. Meet constitutional minimum standards.

To conclude, for the reasons stated in this Order, sections 5 and 6 of the Consent Decree mandating that all schools be racially balanced to the ±15% limitation until July 1, 2000, is eliminated and rescinded. The Court also concludes that the State and Local Defendants have substantially complied in good faith with the Court's orders concerning pupil assignments and other elements of the Remedial Orders of this Court to the extent discussed herein; and that the vestiges of unlawful pupil segregation have been eliminated to the extent practicable. The Court Orders that Defendants are entitled to a declaration of unitary status with respect to pupil assignments; and that the Court's jurisdiction over pupil assignments is dissolved so as to permit the school authorities to henceforth assign pupils in accordance with their best judgment. The Court does not decide if all vestiges of state-imposed school segregation have yet been eliminated to the extent practicable.[13]

IT IS SO ORDERED.

## APPENDIX A

March 3, 1995.

### ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

In recent weeks, the Court has monitored with increasing concern escalating controversy within the Cleveland School District (the District). The Court is particularly concerned that such controversy has affected the City of Cleveland Board of Education's (the Board) ability to administer its educational agenda and to achieve uninterrupted implementation of this Court's Remedial Desegregation Orders and the recently approved Consent Order designed to accelerate achievement of unitary status of the District and cessation of continuing judicial supervision. The culmination of this internal dissention was the resignation and departure from the city of the District School Superintendent on March 3, 1995, the date of this Order, shortly following the recent departures in January, 1995, of the District Deputy Superintendent of Educational Programs and Deputy Administrator for Support Services. Coupled with the above events, is the District's critical financial condition and its failure to secure the required support for its application to the State Board of Control for approval and authorization to negotiate a 29.5 million dollar emergency loan to meet its day-to-day operational costs for the remainder of the fiscal year ending June 30, 1995. The above concerns, along with additional information brought to the attention of the Court by the Office on School Monitoring and Community Relations, prompted the Court sua sponte to convene a hearing to determine if the Cleveland School District and its Board of Education are capable of uninterrupted implementation of the Court's Desegregation Remedial Orders and the Consent Decree entered into between the parties on 5/25/94.

A hearing was conducted on Friday, February 24, 1995 attended by all parties. From the statements of counsel, the evidence, and additional documentation from the Office on School Monitoring and Community Relations, the Court makes the following findings:

1. The District has virtually exhausted its roughly half billion dollar operating fund budgeted for the fiscal year ending June 30, 1995; and

2. The District is confronted with a projected shortfall of 29.5 million dollars for the balance of its fiscal year ending June 30, 1995;

3. The State Superintendent of Public Instruction (State Superintendent), to date, has refused to support the District's application

---

13. The Court notes that the Plaintiffs in this case initiated three ancillary motions: (1) Motion to Recuse, Pursuant to 28 U.S.C. 455(a) filed on January 12, 1996, denied on February 1, 1996; (2) Motion for a Writ of Mandamus and Prohibition before the Sixth Circuit Court of Appeals filed on February 5, 1996, denied by that Court February 6, 1996 (time to file Petition for Certiorari before the Supreme Court of the United States expired May 7, 1996); (3) Motion to Vacate and Rescind Receivership Order filed January 12, 1996, denied February 1, 1996 (No appeal taken).

Accordingly, the Plaintiffs were not prevailing parties on any of these motions within the dictates of Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

to the State of Ohio Board of Control for authorization to seek a 29.5 million dollar loan because of the Board's refusal since October of 1994, to account for the status of approximately 40 million dollars advanced to the District by the State of Ohio during the 1994–95 fiscal year and the District's matching contribution in the same amount in compliance with the Desegregation Compliance Plan and Consent Decree dated 5/25/94, and the District's refusal to approve a Compliance Management Plan in a form acceptable to the State Superintendent;

4. The Board has not identified a lender that has agreed to advance, or is even considering advancing, a loan in the required amount of 29.5 million dollars;

5. The District's debt-to-revenue ratio is 25%—the highest in the state among comparable districts in the state:

| | | |
|---|---|---|
| a. | Akron | 1.8% |
| b. | Canton | 4.7% |
| c. | Cincinnati | 7.0% |
| d. | Youngstown | 13.1% |
| e. | Toledo | 1.0% |
| f. | Columbus | 0.% |
| g. | Dayton | 0.% |

6. The District concedes existing and projected escalating indebtedness in the following amounts:

a. $128,605,000 on June 30, 1994; projected to—
b. $144,540,000 on June 30, 1995;
c. $147,478,000 on June 30, 1996

7. The absence of effective Fiscal and Management Controls, and other Systems Controls, has exacerbated the District's operational shortcomings and materially eroded its efforts and capability to fulfill its educational and Court ordered desegregation responsibilities;

8. The announced resignation and departure of the District Superintendent, and the recent abdication in January of 1995 of two key staff personnel, i.e., the Deputy Superintendent of Educational Programs and the Deputy Administrator of Support Services, has created a leadership and management void within the District;

9. The Coopers & Lybrand 1991–92 Budget Analysis Report commissioned by the District dated March 10, 1991, as confirmed by a District–Wide Facility Study of the Cleveland City Schools dated December 15, 1994 conducted by DeJong & Associates, Inc. and Planning Advocates, Inc., concluding that in 1991, the District had eleven million square feet of building capacity (suitable for an enrollment of 110,000 students), of which 4 million square feet was excessive in light of the District's stabilized enrollment of approximately 70,000 to 73,000 students and the recommendation of those reports that between 14 and 25 of the District's buildings should be replaced or abandoned as beyond repair, has been ignored by the Board for at least two, and more probably three, years last past. (See also this Court's Order of June 4, 1984, addressing a Board request submitted in April of 1980 requesting permission to systematically close eighteen school facilities, which request was approved in August of 1980 and later abandoned by the Board.);

10. The Board has no viable contingency plan in place to effectively address the current deteriorating Professional and Executive Staffing and Fiscal conditions that prevail within the District:

(a). Although the Court commends the Board in seeking a dialogue with the *Business Community* with a view toward evolving long-range management of fiscal and system controls in the District and encourages the District's effort to involve the *Business Community* in meaningful oversight responsibility, the corrective measures proposed by the District lack definition and will not alleviate the immediate crises confronting the District;

11. The State Superintendent has acknowledged the responsibility and authority invested in his office by the Ohio Constitution and its duly enacted statutes, the Court's Desegregation Remedial Orders, the Consent Decree and this Court's Orders dated 5/16/79 and 5/13/86, and has advised the Court of his office's ability to immediately implement emergency action necessary to stabilize the

crises confronting the District and present, for Court approval, a finalized interim and long-range plan for the reorganization of the District's Management Systems and Fiscal and Budgetary Controls;

12. The Court assigns credibility to the State Superintendent's professional and administrative credentials, his experience and commitment to exercise the responsibility delegated to his office, including his continued implementation of Vision 21;

13. The District is confronted with a financial crisis of magnitude and is without an experienced executive staff necessary for an uninterrupted and effective implementation of its Desegregation Remedial Orders of this Court and the Consent Decree of 5/25/94; and

14. Any interruption or delay in the timely execution of the District's executive responsibilities will be detrimental to and materially jeopardize the status of and the effective continuing implementation of the Court's Desegregation Remedial Orders and the Consent Decree of 5/25/94.

The Court concludes, as a matter of law, that the ultimate supervision of the District has been delegated to the State Superintendent, acting on behalf of the State of Ohio Board of Education, pursuant to authority vested in that office by the Ohio Constitution, its duly enacted statutes, the 2/6/78 Remedial Order of this Court, the 5/25/94 Consent Decree incorporated therein, this Court's final orders dated 5/16/79 and 5/13/86 and this Order.

Accordingly:

1. The State Superintendent is directed to assume immediate supervision and operational, fiscal and personnel management of the District, including, but not limited to, administration of its educational policies and all other powers incident thereto during the state of crisis confronting the said District and until further order of this Court.

2. The State Superintendent shall forthwith expedite approval of the State Board of Control to negotiate a loan in the amount of 29.5 million dollars in the name of the Cleveland School District to provide necessary funding for the operation of the District for the remainder of the fiscal year ending June 30, 1995, and will lend the support of his office to negotiate such a loan with available interested lenders.

3. The State Superintendent shall immediately initiate and implement action to designate and appoint Professional and Executive Staffing under his immediate direction and control necessary to the uninterrupted implementation of this Court's various Desegregation and Remedial Orders, including this Order and the Consent Decree of 5/25/94.

4. The State Superintendent shall finalize the development and implement, subject to Court approval, an interim and long-range plan of reorganization of the District's Professional and Executive Staffing, its Management and Control Systems, its Budgetary and Fiscal Controls, and all things incidental to stabilizing the fiscal and operational performance of the District during its period of crisis.

5. The State Superintendent shall, on a regular monthly basis, report to the Court the progress and status of the reorganization of the Professional and Executive Staffing of the District and its Systems Budgetary and Fiscal Controls.

6. The Board, the District, and their Professional, Executive and other personnel shall support the actions directed by the State Superintendent without direct or indirect interference with his implementation of this Court's Order.

7. The Board shall, by not later than May 1 of 1995, identify at least 14 school buildings that should be closed as beyond repair and recommend to the State Superintendent a schedule of closing dates.

8. The Board, in consultation with the State Superintendent, shall continue to consider and determine the timing for resubmission of a school operating levy to the electorate.

The Court is unaware of any State laws which this Order contradicts. To the extent any State law provision shall impede the implementation of this Order, such law is

held to be inapplicable. This Order is necessary to remedy rights under the Fourteenth Amendment under the United States Constitution and necessarily takes precedence over any contrary State or local laws or provisions. *See, e.g., Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Jenkins v. Missouri,* 639 F.Supp. 19, 43–46 (W.D.Mo.1985), *aff'd* 807 F.2d 657 (8th Cir. 1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987).

Hopefully, the Board, the District and the entire community is prepared to recognize the existing realities of the crisis confronting the Cleveland school system and the need for immediate, decisive, and perhaps unpopular action required to eliminate all vestiges of desegregation and expediently return the control of the schools to local authorities without judicial supervision at the earliest practicable date, thereby making the Board accountable to the citizenry and the political elective process of the Cleveland School District.

IT IS SO ORDERED.

## APPENDIX B

*DEFENDANT CLEVELAND BOARD OF EDUCATION'S FACILITIES UTILIZATION PLAN'S ANNUAL REVIEW*

Now comes Defendant Cleveland Board of Education and respectfully submits its Facilities Utilization Plan's Annual Review (attached hereto and marked as Exhibit "A") pursuant to the Orders of this Court.*

Defendant Cleveland Board of Education states that the State has approved the Facilities Utilization Plan's Annual Review, (letter of Roger Lulow attached and marked as Exhibit "B") and further that copies of the Facilities Utilization Plan's Annual Review have been shared with the Office on School Monitoring and Community Relations.

* Editor's Note: Exhibits A and B not reproduced.

/s/ Thomas C. Simiele
  THOMAS C. SIMIELE
  Attorney for Defendant
  Cleveland Board of Education

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendant Cleveland Board of Education's Facilities Utilization Plan's Annual Review were mailed this 12th day of August, 1987, to each of the following:

James L. Hardiman, Esq.

Dr. Leonard Stevens, Dir.
Office on School Monitoring
and Community Relations

Grover G. Hankins
General Counsel
Knox
Associate General Counsel

Mark O'Neill, Esq.
Weston, Hurd, Fallon,
Paisley & Howley

/s/ Thomas C. Simiele
  THOMAS C. SIMIELE
  Attorney for Defendant
  Cleveland Board of Education

## APPENDIX C

## SETTLEMENT AGREEMENT

### SECTION 1—THE PARTIES

The Parties to this Agreement are all of the parties in the Cleveland school desegregation case, *Reed v. Rhodes,* Case No. C73–1300 in the United States District Court for the Northern District of Ohio, Eastern Division. They are: The class of all African–American pupils in the Cleveland public schools and their parents, represented by the named representatives of the Plaintiff class and their counsel ("Plaintiffs"); the Board of Education of the Cleveland City School District, its members and its Superintendent ("Local Defendants" or "the District"), and the Ohio State Board of Education, its members and the Superintendent of Public Instruction ("State Defendants").

SECTION 2—EFFECTIVE DATE AND TERM

2.1. The effective date is the date on which the Court approves a Consent Decree incorporating the terms of this Agreement.

2.2. This Agreement and all subsequent agreements intended to give full effect thereto, shall remain in effect until July 1, 2000, at which time they will terminate. The Defendants shall thereupon be released from all further obligation thereunder.

SECTION 3—PURPOSE

The purpose of this Agreement is to bring *Reed v. Rhodes* to an orderly and just resolution, consistent with the remedial orders, by eliminating, to the extent practicable, those conditions that the Plaintiffs and the District believe are vestiges of past unlawful segregation in the District; to reconcile all outstanding differences between the Parties; to support the reformation of the educational processes in the Cleveland School District; to assure that education will continue in desegregated settings; to provide sufficient funding, consistent with local voters' support, for the educational initiatives known as Vision 21; to provide for monitoring of implementation, the identification of problems, and the resolution of potential disputes about compliance with either remedial orders or the provisions of this Agreement; and to authorize the State Superintendent of Public Instruction and the Court to assure compliance with the undertakings hereinafter defined.

SECTION 4—VISION 21

4.1. The District designed Vision 21 as a seven-year educational improvement and desegregation plan to improve the educational achievement of children in the Cleveland School District. Those programs contemplated by Vision 21 which will receive State financial support are identified in summary form in Appendix B to this Agreement. The Cleveland Defendants shall implement them, except as otherwise provided in this Agreement or ordered by the Court. Appendix A contains a summary of the complete Vision 21 Program.

4.2. If the District elects not to implement Vision 21 as described in Appendix B, or it believes that for financial or other reasons it is unable to implement them, the Parties shall be consulted before the District commits to any change.

SECTION 5—MAINTENANCE OF FACULTY AND PUPIL DESEGREGATION

5.1. Prior to the opening of school each fall, no school may have a student or faculty racial composition during the life of this Agreement which varies by more than ±15 percentage points from the districtwide averages for elementary, middle and high schools.

5.2. The sole exceptions to Section 5.1 are the variances existing during 1993–1994 and agreed to for the 1994–1995 and 1995–1996 school years, as provided in Section 6, and kindergarten classes and Lau sites, which shall be excluded from the calculations.

5.3. Defendants may employ such corrective measures as they deem appropriate to achieve the objectives of Section 5.1.

SECTION 6—PERMISSIBLE VARIANCES IN STUDENT ASSIGNMENTS

6.1. During the 1994–1995 school year the following schools may exceed the ±15 percentage point parameters:

1. East Clark
2. Euclid Park
3. Iowa–Maple
4. Adlai Stevenson
5. Andrew J. Rickoff
6. John F. Kennedy
7. Wade Park
8. Louis Agassiz
9. Nathaniel Hawthorne
10. Riverside
11. Corlett

6.2. During the 1995–1996 school year only the following schools may exceed the ±15 percentage point parameters:

1. Adlai Stevenson
2. Andrew J. Rickoff

6.3. In the 1996–1997 school year and thereafter until July 1, 2000, all schools shall comply with the requirements of Section 5.1.

## SECTION 7—STATE FINANCIAL SUPPORT

7.1. Subject to the conditions defined in Section 8 of this Agreement, the State will provide a total of $295 million to support the desegregation-related and remedial order-related components of Vision 21 during the seven-year period from July 1, 1993 through July 1, 2000.

7.2. Of the foregoing $295 million, $275 million will match $275 million in local funding. The District may defer a portion of its 50/50 matching obligation in any given year, as agreed by all the Parties, provided that at the end of the term on July 1, 2000 the District will have met its matching obligation.

7.3. Twenty Million Dollars ($20 million) will not require a 50/50 match by the District.

7.4. The District may request payment of State dollars in varying amounts during each of the seven years, subject to a limit of $60 million in any one fiscal year.

7.5. A determination that the District lacks sufficient funds to support the programs in Appendix B shall not require additional State funding beyond the limits specified in the provisions of this Section 7. The State financial support agreed to in Section 7.1 constitutes the extent of the State's required financial contribution.

7.6. By May 1, 1994 the District will provide the State with a schedule of projected annual payment requests over the life of the Agreement.

7.7. The District will formulate and submit the amount of its initial request for State financial support for an upcoming biennial budget not later than November 1 of the preceding year. The State will review the request and either concur and initiate the process to gain necessary approval to implement the request, or initiate discussions with the District to reach agreement on an acceptable amount. Any financial disagreements unable to be resolved may be appealed to the Court pursuant to Section 16.3.

## SECTION 8—LOCAL FINANCIAL SUPPORT

8.1. The District will place a general operating levy before the voters in May 1994 and at least once a year thereafter until passage of the millage request(s) sufficient to cover the projected cost of the District's compliance with this Agreement provided, however, that the Parties may agree not to submit a levy at a particular election if they are satisfied that it would be counterproductive. All Parties agree to support the District's efforts to pass the requisite millage(s).

8.2. The District will make every reasonable effort to maximize Medicaid reimbursement for Medicaid-eligible students.

8.3. By February 1, 1995 the District will adopt a strategic plan for facilities improvement. It shall include a multi-year facilities plan until July 1, 2000 and the institutionalization of a permanent improvement fund. A permanent improvement levy shall be placed before the voters in November 1995, unless otherwise agreed by the parties, and in future elections, as mutually agreed by the parties, until passage.

8.4. The District shall seek full advantage of capital dollars for facilities improvements which may be available to it under State law, including Revised Code Section 3313.372.

8.5. The District shall make significant redirection of Chapter One, reading and other dollars to Vision 21, to the extent consistent with applicable law. In any redirection of such funds, the District shall assure that the dollars are focused on the intended beneficiaries of the particular programs.

8.6. Not later than April 15, 1994, the Parties shall agree upon an interim plan to govern facilities improvements, replacements and expenditures until such time as the strategic plan required by this Section 8 is adopted.

## SECTION 9—COMPLIANCE WITH EXTANT REMEDIAL ORDERS

The Parties stipulate that the Defendants have complied with the extant remedial orders to the extent specified by OSMCR in the proposed findings contained in its reports

of July 29, 1991, May 1992 and November 1993.

SECTION 10—MODIFICATION OF REMEDIAL ORDERS

10.1. As authorized by the Order of August 14, 1987, as amended, the Parties may from time to time jointly propose vacation or modification of extant remedial orders, as changing circumstances warrant. The State Superintendent of Public Instruction shall continue to report to the Court on tripartite modifications agreed by the Parties.

10.2. All Parties shall meet and confer on or before October 1, 1994 and periodically thereafter to identify those orders which can be vacated or modified as a result of this Agreement. If the Parties agree that certain orders can be vacated or modified, they shall file with the Court as soon as practicable a joint motion describing such orders and seeking their vacation or modification.

SECTION 11—DEFENDANTS' CONTINUING DUTIES

In addition to complying with the extant remedial orders which have not yet been fulfilled. Defendants shall also demonstrate by July 1, 1997 their compliance with the following commitments.

11.1. In their operation of the District, Defendants shall refrain from segregation or racial discrimination in any form.

11.2. Schools shall be subject to appropriate intervention as described in Section 11.3 if the scores of their students rank such schools in the bottom quartile of the District's schools on all State proficiency tests, where applicable, or on other annual standardized measures of student achievement, such as the California Achievement Tests. Schools shall also be subject to appropriate intervention if they exhibit substantial disparities by race in student expulsions or suspensions. Appropriate intervention strategies shall be implemented no later than the beginning of the academic year following the determination that a specific school has met the criteria of this Section, unless otherwise agreed by the Parties.

11.3. "Appropriate intervention" by the District shall include, but not be limited to, any or all of the following techniques:

a. Reallocation of academic, financial and other resources;

b. Reduced ratio of pupils to certificated classroom teachers;

c. Reassignment of administrators, faculty and/or staff;

d. Redesign of academic program(s); and, as a last resort,

e. Reconstitution of the school, including but not limited to reassignment of administrators, faculty and/or other staff; and/or redesign of academic program(s); and/or reallocation of funds; and/or restaffing only with people willing to commit to the school's program and philosophy and to remain for a period of no less than three years.

11.4. The District will develop and use an enhanced multi-racial/multi-cultural curriculum. The enhanced curriculum will seek to assure that students are presented academic material which is equitable and historically objective in its presentation of the contributions to American life and development by people and groups reflecting the various racial, ethnic and religious backgrounds within the American population. The District's enhanced curriculum will incorporate the use of guest lecturers and speakers, including those drawn from the African–American, Native–American, Asian, and Hispanic communities.

11.5. The District will consult Plaintiffs on the continued siting and projected funding of all existing, or enhanced, or new magnet schools, magnet programs, and community model schools. The Parties shall meet and confer on all such existing schools or programs within 30 days after approval of this Agreement and its entry as a Consent Decree, and annually thereafter as to future enhanced or new magnet schools, magnet programs, and community model schools.

SECTION 12—REPORTING REQUIREMENTS AND ROLE OF OSMCR

12.1. The Parties agree to confer on or before September 1, 1994 to determine the needs for a reporting system reflecting the duties set forth in extant remedial orders and

this Agreement. If the Parties and the Director of OSMCR agree that such need exists, they will prepare and submit a relevant proposed reporting mechanism for the Court's approval, no later than October 1, 1994.

12.2. The Parties will continue to support the monitoring function of OSMCR, and agree to work to achieve a cost-effective system of oversight and public reporting until July 1, 1997, when the Court shall determine the scope and nature of any subsequent monitoring.

12.3. The Cleveland and State Defendants will take all reasonable measures to ensure the availability of such information as OSMCR determines it needs to perform its monitoring functions, and shall *equally* provide the monies to finance the operation of OSMCR.

12.4. The Parties agree that implementation of this Agreement warrants continuing suspension of the District's reporting obligations under extant orders, pending further agreement by the Parties or orders of the Court. The Parties further agree and propose to the Court that it vacate so much of the reporting requirements as relate to the Unfinished Compliance Agenda (now Management Systems Review), set forth in the Order of August 14, 1987.

12.5. The Parties agree and propose to the Court that:

a. OSMCR serve as a point of contact for School Community Councils or other members of the public who seek information on implementation of either the provisions of this Agreement or of the Court's remedial orders. OSMCR may forward any such inquiry to any of the Parties, and the Parties agree to respond to any such forwarded inquiry within a reasonable time.

b. OSMCR prepare and conduct an annual orientation for School Community Councils and Parent Communication Centers, with such assistance from the Parties as may be requested by the Director of OSMCR.

c. OSMCR provide to each School Community Council and Parent Communication Center a copy of each report called for in this Agreement or by the remedial orders, along with such other information as may be useful.

## SECTION 13—INTERIM ASSESSMENT OF COMPLIANCE PROGRESS

13.1. At least annually, commencing not later than July 1, 1994 and more frequently if requested by any Party, all Parties shall meet and confer to assess the status of Consent Decree implementation and compliance with relevant remedial orders. Representatives of OSMCR shall participate and shall provide updated reports of its own assessment of compliance.

13.2. From time to time as OSMCR deems advisable, it shall inform all Parties of matters relevant to the Defendants' ongoing performance obligations.

13.3. Plaintiffs shall promptly notify Defendants of any matters which implicate possible issues of non-compliance so that Defendants may have ample opportunity to address and correct matters of concern to Plaintiffs.

13.4. Until July 1, 2000, the District and the State Department of Education will each assign oversight of this Agreement to an individual to be appointed to cabinet rank from each organization, each of whom shall report directly to their respective superintendents. The salaries and necessary support for both positions shall be paid from Fund 12.

13.5. The Superintendent of Public Instruction shall be obligated to monitor progress and where necessary investigate compliance with this Agreement and to order such action as may be required to effect compliance.

13.6. The State Superintendent shall monitor the District's receipt and use of Federal and State funds designated by the District to implement any remedial requirement or provision of this Agreement, including but not limited to Medicaid, Chapter One, special education and vocational education funds.

**SECTION 14—JOINT ANNUAL RE-PORTS TO THE COURT**

Not later than August 31, 1995 and August 31, 1996, the Parties shall submit, in concert with OSMCR, a joint report to the Court concerning the status of Consent Decree implementation and compliance with relevant remedial orders. Each Party may submit its own comments as a supplement to the joint report.

**SECTION 15—COMPLIANCE HEARING**

On or after July 1, 1997, the Parties shall move the Court to schedule a public hearing at its earliest convenience to assess compliance with relevant remedial orders and the terms of this Agreement. The Parties shall request, after appropriate evidentiary proceedings, that the Court enter its Order releasing the Defendants from all further obligations, except those which are defined herein for the period from July 1, 1997 to July 1, 2000, if it finds that:

a. The Defendants have implemented all provisions of this Agreement and complied with all extant remedial orders to the extent practicable; and,

b. All vestiges of past discrimination and segregation have been eliminated to the extent practicable; and,

c. The Defendants have otherwise demonstrated good faith commitment to their constitutional obligations.

**SECTION 16—ENFORCEMENT POWERS OF STATE SUPERINTENDENT**

16.1. During the term of this Agreement the State Superintendent of Public Instruction shall be authorized to entertain complaints from Plaintiffs concerning the Defendants' failure to comply with the terms of this Agreement. The State Superintendent of Public Instruction shall have authority to order the District to undertake any appropriate corrective measures.

16.2. The authority of the State Superintendent of Public Instruction to enjoin programs or actions deemed adverse to desegregation requirements or to order actions deemed necessary to fulfill them shall remain intact throughout the life of this Agreement and may include individual schools as well as systemwide activities.

16.3. The District shall have the right of appeal to the Court as to any action ordered by the State Superintendent of Public Instruction. Appeal shall not be taken unless personal consultation between the two superintendents has failed to resolve their differences. Should such consultations predispose the State superintendent to rescind or modify the order, Plaintiffs' counsel will be notified and given an opportunity to be heard before such rescission or modification.

**SECTION 17—CONSTRUCTION; MODIFICATION**

17.1. To the extent that any of the terms of this Agreement conflict with provisions of extant remedial orders, the Parties agree and propose to the Court that this Agreement take precedence.

17.2. This Agreement may be modified only by a writing signed by authorized representatives of all Parties and approved by the Court.

**SECTION 18—INTERDISTRICT TRANSFERS**

18.1. The Parties reaffirm their belief in the value of desegregative interdistrict student transfers between Cleveland and other school districts within the Greater Cleveland area.

18.2. Not later than July 1, 1994 the Parties shall consult to develop a joint approach to encourage desegregative interdistrict transfers. This approach shall employ every reasonable means, consistent with State law, to encourage and facilitate such transfers between the District and other school districts in the Greater Cleveland area.

**SECTION 19—PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The Parties take notice of Plaintiffs' motion filed February 22, 1994 for a preliminary injunction seeking suspension of State law and regulations which would withhold diplomas from high school seniors who have not passed the ninth grade proficiency test. The Parties agree that the impact of that motion is limited to the postponement of the effec-

tive date of the proficiency test requirements, a matter which is beyond the authority of the State Defendants to grant or waive.

IN WITNESS WHEREOF, the Parties have hereunto subscribed their names at Cleveland, Ohio this 15th day of March, 1994.

THE PLAINTIFF CLASS, BY ITS COUNSEL OF RECORD

/s/ Thomas L. Atkins
    Thomas L. Atkins

/s/ James L. Hardiman
    James L. Hardiman

/s/ David W. Whitaker
    David W. Whitaker

THE BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT

By: Lawrence Lumpkin
    Lawrence Lumpkin,
    President

THE SUPERINTENDENT OF SCHOOLS

/s/ Sammie Campbell Parrish
    Sammie Campbell Parrish

APPROVED BY COUNSEL

/s/ Wanda Rembert Arnold
    Wanda Rembert Arnold

/s/ Frederick R. Nance
    Frederick R. Nance
    Dennis G. Terez
    Squire, Sanders & Dempsey

/s/ Ricardo B. Teamor
    Ricardo B. Teamor
    Adrian D. Thompson
    Teamor, Agyeman & Thompson

/s/ Maree Sneed
    Maree Sneed
    Hogan & Hartson

THE OHIO STATE BOARD OF EDUCATION

By: Oliver Ocasek
    Oliver Ocasek, President

THE SUPERINTENDENT OF PUBLIC INSTRUCTION

/s/ Ted Sanders
    Ted Sanders

APPROVED BY COUNSEL

Lee Fisher, Attorney General

By: Mark O'Neill
    Mark O'Neill
    Special Counsel for the Ohio State Board of Education and Superintendent of Public Instruction

APPENDIX D

IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

Civil Action No. C73–1300

Judge Robert B. Krupansky

Robert Anthony Reed, *et al.,*

Plaintiffs,

v.

James A. Rhodes, *et al.,*

Defendants.

May 16, 1995.

JOINT STIPULATION

1. The District's motion for declaration for partial unitary status as to student assignments is withdrawn without prejudice to any of its rights, including the right to refile a similar motion at a future date.

2. The parties agree that student assignments may be made for the 1995–96 school year in accordance with the State plan proposed to the Court, a copy of which is attached as Exhibit A.█

3. No party will challenge the State's assignment plan as a violation of the Consent Decree.

4. Neither the implementation of the State's plan nor any incremental increase in the number of racially identifiable schools (meaning schools exceeding the ±15 percentage point parameters) occurring in the 1995–96 school year shall be deemed or treated as a Consent Decree violation or as evidence of lack of substantial compliance with the extant remedial orders or the Consent Decree.

5. The State and the District shall make every reasonable effort to implement the educational components of the Consent Decree in accordance with the schedule provided therein.

6. Not later than November 13, 1995, the Superintendent, after consultation with the parties, shall submit a report to the Court evaluating the results of pupil assignments for the 1995–1996 school year.

7. Not later than December 31, 1995 the parties shall present to the Court an agreement concerning pupil assignments which shall last for the term of the Consent Decree.

8. If the parties fail to reach agreement by December 31, 1995, any party may move the Court on or before January 31, 1996, or the Court may convene hearings *sua sponte*, to consider pupil assignments for the school year 1996–1997 and thereafter.

9. The Superintendent shall have discretion to implement the provisions of the student-assignment plan.

10. Upon approval by the Court, this Joint Stipulation shall be deemed a modification of the Consent Decree for the school year 1995–1996.

Executed at Cleveland, Ohio this 16th day of May, 1995 by the undersigned attorneys of record for the parties.

THE PLAINTIFF CLASS, BY ITS COUNSEL OF RECORD

/s/ Thomas I. Atkins
    Thomas I. Atkins

/s/ James L. Hardiman
    James L. Hardiman

/s/ David W. Whitaker
    David W. Whitaker

THE BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT

and

THE SUPERINTENDENT OF SCHOOLS

APPROVED BY COUNSEL:

/s/ Wanda Rembert Arnold
    Wanda Rembert Arnold
    General Counsel
    Cleveland Board of Education

/s/ Frederick R. Nance
    Frederick R. Nance
    Dennis G. Terez
    Squire, Sanders & Dempsey

/s/ Adrian D. Thompson
    Adrian D. Thompson

THE OHIO STATE BOARD OF EDUCATION

and

THE SUPERINTENDENT OF PUBLIC INSTRUCTION

APPROVED BY COUNSEL:

BETTY MONTGOMERY

ATTORNEY GENERAL OF OHIO

/s/ Margaret Anne Cannon
    STEPHEN O'BRYAN

    MARGARET A. CANNON

    Kelley, McCann & Livingstone

/s/ Mark O'Neill
    MARK O'NEILL

    RAYMOND S. LING

    Weston, Hurd, Fallon, Paisley, Howley

Special Counsel to the Attorney General
and the State Defendants

The foregoing Joint Stipulation and agreement between counsel is hereby approved by the Court.

/s/ Robert B. Krupansky
    ROBERT B. KRUPANSKY
    United States Circuit Judge
    United States Court of Appeals
    for the Sixth Circuit
    Sitting by designation

### APPENDIX A

### THE CLEVELAND CITY SCHOOL DISTRICT'S EXECUTIVE SUMMARY OF VISION 21

*Introduction and History*

Vision 21 is the result of a mandate from the people of Cleveland that the Cleveland City School District as it presently exists is unacceptable; that students are not performing in a manner that reflects their tremendous potential; and that the City of Cleve-

land will not be ready to enter the 21st century as a major urban center if the schools do not drastically change the way they do business.

Based on this clear mandate, Superintendent Sammie Campbell Parrish invited the community, the Board of Education, and the staff to create a blueprint for the kind of schools Cleveland wants and deserves. During the fall of 1992, she convened 26 work teams to examine specific areas and to present her with their visions of what the educational program in Cleveland should look like in each of the assigned areas. These work teams were made up of parents, teachers, administrators, corporate and community representatives, and other individuals interested in improving the quality of the schools in Cleveland. All teams provided the superintendent with written reports that included recommended actions for moving the District forward.

Vision 21 is the product of this broad-based collaborative effort. Its full implementation will result in quality education for all of Cleveland's children with our graduates prepared and willing to take their place as contributing members of the Cleveland community. It is based on current research and reflects the major reform initiatives articulated at the national, state, and local levels.

The major premise on which the plan is based is that all students must be provided with an opportunity to learn. The plan contains three major components designed to provide equitably and effectively these opportunities:

- A COMPREHENSIVE CORE designed to address the educational foundation for all students by outlining the steps required to "raise the floor";
- ENHANCEMENTS TO THE COMPREHENSIVE CORE designed to benefit all students by going beyond core requirements, while focusing particularly on providing equitable opportunities for African–American students as directed by remedial orders of the Federal Court; and
- PARENTAL CHOICE designed to provide a dramatically improved magnet school program and a new system of community school choice.

### A. The Comprehensive Core

The Comprehensive Core incorporates the expanded definitions of the terms "core" and "curriculum" that are needed for the 21st century school. It consists of a body of material or content to be worked on and processed by students as the raw material of their learning, with students functioning as the workers in creating and constructing meaning from the curriculum. They will become empowered to use knowledge in solving the problems they face today and the problems they will face tomorrow.

Cleveland's Comprehensive Core is designed to provide all students with equitable opportunity to learn through a solid educational program similar to those found in well-regarded and effective school districts in which a majority of students are successful learners. Without this solid foundation, no number of added programs or additional enhancements will yield a quality education. This component represents higher standards for all students and provides the steps that must be taken to transform the District's current basic program into a truly comprehensive core.

Twenty-five of the work team reports were used as the basis for this Comprehensive Core. A twenty-sixth report from the Student Assignments Facilities Utilization Study Group, formed the basis of the Parental Choice Section of Vision 21.

Three elements are presented for each of the 25 work team overviews contained in the Comprehensive Core: a vision statement; current barriers to students' opportunity to learn in the specific area; and steps that must be taken to increase opportunity to learn, categorized according to their targeted implementation time frame. Each of these work team overviews is related to one of four general areas: teaching and learning; parent involvement; safe and friendly schools; and management, structure, and support.

B. *Enhancements to the Core*

The District understands and accepts responsibility to educate all of its students successfully and equitably. To this end, it is willing and committed to providing enhancements that go beyond the Comprehensive Core. The Core Enhancements component comprises this portion of Vision 21 and include the implementation of activities which are critical to maximum student growth and removing the traditional barriers to academic achievement for African–American students. These components include the following:

1. *Core Enhancement Program Point 1*

Increase the likelihood that all students will achieve academic success by assuring that they are "well-anchored" in the teaching-learning process. For African–American students, such "anchoring" will facilitate the development of a healthy respect for their cultural heritage and a sense of being at the center of the curriculum rather than on the outside looking in.

   a) Begin the African-centered multicultural curriculum infusion and training process and complete phase-in over a seven-year period.

   b) Design and begin Community Model Schools that provide immersion programs in African-centered multicultural education.

   c) Implement the actions recommended by the work team overview on African centered/multicultural infusion, beginning by retaining assistance to guide the phase-in process and by utilizing a teacher consultant to provide leadership.

2. *Core Enhancement Program Point 2*

Eradicate early school failure among all students by instituting research-based reading approaches and programs that assure virtually every child will learn to read by the first grade or shortly thereafter:

   a) Assure that every reasonable effort is made to have all four-year-old children, who are scheduled to enter kindergarten in the Cleveland Public Schools, enrolled in developmentally appropriate preschool programs.

   b) Assure that every reasonable effort is made to have all kindergartens enrolled in developmentally appropriate full-day kindergartens.

   c) Assure that all first graders are taught reading through a reading program with a proven track record as effective for all students. These models include Reading Recovery, Success for All, HOSTS, and Preparing Students for Early Reading Success.

   d) Assure that one-to-one tutoring is provided for every first grader who needs it to be a successful reader.

3. *Core Enhancement Program Point 3*

Provide teachers who are committed, sensitive, prepared, and confident to meet the diverse needs of African–American and all other Cleveland School students.

   a) Over the next 7 years, recruit well-prepared African–American teachers. This is based on the belief that a racially and ethnically diverse staff is of educational benefit to African–American students in particular and all students in general.

   b) Provide extensive teacher re-training of all Cleveland Public Schools teachers through contract extensions that provide for a two-week professional development program for 25 percent of the teaching work force each year over the next four years. The re-training program will involve extensive teacher involvement in both the planning and implementation phases.

   c) Provide a re-training program for principals in the same strand areas identified for teachers.

4. *Core Enhancement Program Point 4*

Employ time-on-task as an important approach to strengthen student achievement.

a) Provide an extended school year or summer tutorial program for all K–8 students who require additional time to meet district performance standards.

b) Provide an extended school year or summer tutorial program for all high school students who require more time to meet state proficiency objectives.

c) Reduce or eliminate study halls, providing students with more periods of classroom instruction.

d) Convert remaining study halls to peer tutorials where possible.

e) Offer advanced mathematics and science courses in high school in two year sequences so that the majority of students can enroll in and pass advanced course work.

f) Institute a homework hotline or voice mail system to promote homework completion by students.

g) Review and revise attendance policies to assure that they promote rather than discourage school attendance.

h) Employ various mastery learning outcome based education models that radically alter the current rigid approaches to use of time.

### 5. *Core Enhancement Program Point 5*

Expand the use of technology, including instructional management systems, to monitor the academic performance of all students and to ensure the availability of immediate feedback, including as regards the effectiveness of the teaching-learning process for African–American students.

a) Equip all middle and senior high schools with the necessary hardware and software to implement instructional management systems in the Ohio Proficiency Test areas.

b) Provide Saturday and evening training sessions in the use of technology for teachers, principals, media specialists, and others.

c) Establish an educational technology technical assistance component at the Center for School Improvement or in the media technology office.

d) Purchase a test item bank to be used by teachers in constructing teacher-generated interim assessments.

### 6. *Core Enhancement Program Point 6*

Provide students with needed educational support services by implementing a newly developed, culturally sensitive guidance program which is designed to promote higher academic achievement for all students and to remove traditional barriers for the African–American student.

a) Provide one guidance counselor in each elementary school to implement the competency-based guidance program and to promote extensive interagency cooperation so that students and families receive needed support services.

b) Provide the necessary clerical support to middle and high school counseling programs so that counselors can give priority to implementing the new competency-based guidance curriculum.

c) Assure that guidance personnel are retrained, especially in areas of urban education, cultural sensitivity, and competency-based guidance, by providing two-week contract extensions to 50 percent of guidance personnel each year for two years.

### 7. *Core Enhancement Program Point 7*

Increase the likelihood that all students will experience academic success by systematically drawing parents, guardians, and other family members into equal and full

partnerships with the schools. This is particularly true for the African–American community where such participation has not been maximized.

a) Provide for each school a parent liaison with the responsibility of offering leadership to parent involvement initiatives.

b) Implement Community Model Schools that have extensive parent involvement as their basic tenet (*e.g.*, Comer schools).

c) Provide active and exciting team-based learning experiences for parents, teachers, and principals to improve trust between school and home.

d) Request that the parents of four-, five- and six-year-old children enter into written contracts with their child's school. These contracts will outline the responsibility of parents and teachers in the prevention of early school failure.

e) Establish at least three Community Model Schools that include human services centers.

f) Include parent involvement as an integral factor when assessing staff performance.

g) Assure that all action steps outlined in the Parent Involvement work team report are implemented.

h) Develop and administer an annual survey of parents to determine the degree of parent satisfaction with the schools and the opportunity for meaningful parental involvement.

### 8. *Core Enhancement Program Point 8*

Assure that students receive the high-quality education outlined in this plan in a desegregated setting.

a) Provide parents with adequate and equitable access to quality districtwide magnet schools and quality community model schools that use approaches based on national models that work for all children.

b) Ensure that no student is required to attend a racially identifiable school and that all parents have the choice of sending their child to a school whose racial makeup is in keeping with the districtwide racial makeup.

c) Provide for the reconstitution of any school that has not demonstrated sufficient academic performance. Reconstitution may involve clearing the school of staff and programs in order to reinvent a school that works for its school population and community.

### C. *PARENTAL CHOICE: A Choice Between Quality and Quality*

Vision 21 transforms the current traditional student assignment plan into a plan that is truly in keeping with 21st century concepts of quality public education for all. Based on the needs and interests of their children and consistent with the District's desegregation obligation, parents will select from among a number of quality choices.

There will be more choices from among new and expanded magnet schools and programs for students at all grade levels. The development of the new magnet school program was based upon sound educational and desegregative principles, including the following:

(1) Locate programs more equitably geographically to promote voluntary desegregation;

(2) Increase equitable access by expanding magnet programs, thus reducing or eliminating large waiting lists;

(3) Move to a uniform grade structure of K–5, 6–8, and 9–12; and

(4) Provide new elementary magnet programs that will serve as feeder pro-

grams for existing secondary programs.

## D. SIX SYSTEMIC CHANGE PRIORITIES

The District realizes that not all of Vision 21 can be implemented immediately. It has prioritized the work so that it may begin immediately to address the most pressing needs of students. To do so, the District has identified six initiatives for change, and the action steps required for their implementation.

### 1. Systemic Change Priority

There must be an immediate and fundamental shift in emphasis from failed attempts at remediation to successful efforts to prevent early school failure.

#### a) Action Steps

(1) Provide to the extent feasible through the Cleveland Public Schools or other qualified pre-school providers a developmentally appropriate pre-school program to all four-year-olds scheduled to enroll in Cleveland Public Schools.

(2) Provide to the extent feasible a developmentally appropriate full-day kindergarten to all Cleveland Public School students of kindergarten age.

(3) Provide all first-grade students with a reading approach backed by research evidence that vouches for effectiveness.

(4) Actively engage all families of four-, five-, and six-year olds in the early school success initiatives. Included in this effort will be parental school compacts that will briefly spell out parental and school responsibilities.

(5) Involve teachers and principals at each site in determining a flexible grouping and school organization plan for the primary grades reading/language arts block that will reduce the need for long seatwork periods.

(6) Immerse primary-grade children in reading and writing activities, utilizing the social studies, health, and arts curriculum areas as vehicles and further opportunities to learn and use language.

(7) Reconfigure and retarget human and financial resources to reflect the increased emphasis on prevention of school failure. To the extent allowed by federal law and regulation, restructure all federal and state programs for disadvantaged children to focus on early success for all.

### 2. Systemic Change Priority

The Cleveland Public Schools must accept responsibility for the academic performance of its students and resist the urge to blame poor student performance on factors beyond the schools' control. Once such a shift in thinking has been made, educators can focus their primary activities on providing adequate opportunity to learn. For the District's students to have a reasonable change to perform at expected levels, the first step must be to align the written, taught, and tested curriculum.

#### a) Action Steps

(1) Working with schools and the Center for School Improvement, the central office must move quickly and deliberately to align curriculum and classroom instruction with what is tested.

(2) Establish instructional alignment as the highest priority of the Center for School Improvement.

(3) Align all curriculum areas perfectly with national and state standards and curricular frameworks in areas where they exist.

### 3. *Systemic Change Priority*

Begin immediately the real work of authentic reform by establishing a group of 10 to 12 Vanguard, or standard-bearer, schools. Each school in the Vanguard group will have a leadership team comprised of administrators, teachers, parents, students, and community leaders. This committee will ensure equality of opportunity for all learners and will accept responsibility for the quality of education provided. School teams will provide the leadership necessary to transform each school's culture, continually identifying, dismantling, and abandoning those things that work against success for students. A Vanguard school may be any magnet or Community Model School that wants to lead the way in authentic transformation.

#### a) *Action Steps*

(1) Develop a process for selecting Vanguard schools and establishing their purposes.

(2) At no cost to the District, enter into an agreement with the nonprofit Community Training and Assistance Center (CTAC) in Boston, Massachusetts, to provide technical assistance, thereby increasing the school district's capacity to reform itself.

(3) Establish a Vanguard School Linkage Network to assure that Vanguard schools are not perceived as "Model" or "Pilot" schools, but as schools that are leading and learning reform lessons from which all schools will benefit as the district seeks to establish an entire system of schools that routinely work for all of its students.

(4) Design a communications initiative to help the public understand the extent and nature of the change that must occur in schools if Cleveland is to have the schools Cleveland wants. Both the public and the staff must begin to understand that in some cases new programs must take a back seat to new thinking about schools and about the changes in infrastructure that are necessary to make them effective. The District must help the entire community see the need to move away from the ineffective hierarchical structures of yesterday, to a school structure and culture that promotes critical, collaborative, and nontraditional relationships among staff and between school and community.

### 4. *Systemic Change Priority*

Eliminate the "general track" as an option for high school students. Require all students to prepare for one of the following: a four-year college program, a two-year associate degree program at a community college or a technical school, or a high-level vocational program leading to a licensed apprenticeship program after high school.

#### a) *Action Steps*

(1) Define the three program options leading to college prep, tech prep, and apprenticeship programs.

(2) Include algebra in all three programs, recognizing that algebra is a gatekeeper course to future opportunities.

(3) Increase the uniform graduation requirements to reflect what students need to be successful at the next steps beyond high school.

(4) Assume that the majority of students are able to do college level work if they are adequately prepared through proper course work, effective instructional strategies, homework, and family support. Consequently, most students should be automatically enrolled in the courses they need to pursue education beyond high school.

### 5. *Systemic Change Priority*

Begin immediately to implement throughout the district a uniform grade structure

that more adequately meets the developmental and educational needs of students. This change will significantly enhance stability, and in turn increase student performance in those areas detrimentally affected by frequent school changes.

a) *Action Steps*

(1) Implement a revised student assignment plan consistent with a uniform grade structure (K–5, 6–8, 9–12).

(2) Develop a revised magnet school program that is consistent with the new grade structure and which is based on successful programs and schools currently in place.

(3) Establish schools at grades 6–8 that reflect a true middle school philosophy. These schools must be child centered, demonstrate an increased emphasis on the developmental needs of the students, and employ research-based instructional strategies in an effort to ensure student success in school.

6. *Systemic Change Priority*

Begin immediately to develop in each school the capacity to establish and maintain a secure environment. Thinking must shift from a belief that external assistance is needed to ensure safety to a belief that the student and staff at each school have the skills and ability to control their environment.

a) *Action Steps*

(1) Adopt districtwide the Discipline Mission Statement developed by the 1990 Discipline Task Force.

(2) Establish at each school a Discipline Mission Committee comprising representatives from each employee group, parents and students.

(3) Provide appropriate staff development and training to each school Discipline Committee, to build an internal capacity for leadership in maintaining safe and secure sites.

(4) Provide student leadership and conflict resolution training that will empower students with the necessary life-long skills for self-discipline and responsibility.

(5) Develop and monitor annual, needs-based school discipline plans, requiring approval by the appropriate assistant superintendent.

(6) Pilot in selected schools the STAR (Straight Talk About Risks) curriculum, which is designed to reduce violence in schools.

(7) Cooperate with the research and pilot efforts currently being conducted by the Gun Safety Institute designed to change student attitudes and behaviors about guns and violence.

### APPENDIX B

### VISION 21 PROGRAMS SUPPORTED BY STATE MATCHING FUNDS

1. Establishment of Middle Schools

The District will change its grade structure from the current intermediate structure of grades seven and eight to a middle school structure of grades six through eight. The staffing ratio at the 18 middle schools will be 19 students to 1 teacher, so that teachers can effectively implement the middle school concept, which depends on small class size, team teaching, and close teacher-student bonds. Approximately 175 additional classroom teachers will be needed to reduce the staffing ratio to 19:1. Additional security officers and Youth Resource Center Coordinators will be added to the middle schools.

The estimated cost of this restructuring over seven years is approximately $57 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 4.0 | 5.5 | 7.0 | 8.5 | 10.0 | 10.5 | 11.5 |

## 2. Expanded Magnet School Program

The District will enlarge the capacity of its magnet schools from 6,800 seats in 1992–93 to approximately 12,800 seats by the 1994–95 school year.

The District will implement nine magnet themes at fifteen schools. These programs will require the addition of specialized teachers, new librarians, program coordinators and other specialized staff. The projected cost of these programs over seven years is approximately $13 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 3.0 | 2.0 | 1.7 | 1.5 | 1.5 | 1.6 | 1.7 |

## 3. Community Model Schools

All non-magnet elementary schools will become community model schools over the next three years. Community model schools are elementary schools that will incorporate approaches to school improvement based on one of several nationally recognized, research-based models of elementary instruction. Each community model school will also include full-day kindergarten programs for all students each day.

Proposed models include the Comer Model, the Gardner Multiple Intelligences Model, the Afri-centric/Multicultural Immersion Model, Non-graded Schools, Outcomes-Based Education, Family–Center Schools, and Parent–Teacher Cooperative Schools. School staffs and community members and representatives of the Plaintiff class together will identify the preferred model for their school community.

The District will hire additional teachers and psychologists, social workers and other specialists to implement these programs. Approximately 60 additional teachers will be hired to help implement the full-day kindergartens.

The estimated cost of this program for elementary pupils over seven years is approximately $63 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0.5 | 4.5 | 8.5 | 11.0 | 12.0 | 12.5 | 14.0 |

■■■■■■

#### 4. Reading Programs

The District will implement a series of nationally-recognized reading programs for first graders, which will include one-on-one tutoring for each child, where necessary. The objective is to ensure that by the end of the first grade all children will read. The reading programs will require additional teachers and curriculum specialists for all elementary schools.

The estimated cost of implementing these programs over seven years is approximately $25 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 1.0 | 1.4 | 3.4 | 4.2 | 4.5 | 5.0 | 5.5 |

#### 5. Expanded Guidance Services at the Elementary Level

The District will provide full-time guidance counselors in all elementary schools and additional clerical support to the guidance efforts at secondary schools. Additional professional training for the current counseling staff will be provided.

The projected seven-year cost of these programs is approximately $32 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 1.0 | 1.9 | 4.2 | 5.5 | 5.9 | 6.3 | 7.2 |

#### 6. Parent/Family Liaison Services at the Elementary Level

School–Community Councils and Parent Communication Centers will be joined by a parent liaison person at every elementary school who will encourage parent and community involvement with each school and will work with the School–Community Council and the Parent Communication Centers.

The proposed budget for this new service over seven years totals approximately $7 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0.3 | 0.4 | 1.0 | 1.1 | 1.3 | 1.4 | 1.5 |

**7. Professional Development Programs For All Teachers**

Beginning in June 1994, and continuing each year for the next four years, the District will conduct a two-week professional development program which will serve one-fourth of the teaching staff annually, with ongoing annual follow-up one week per year to continue, beginning in June 1998. The programs, to be presented principally at two-week summer academies at the conclusion of each school year through 1997 and one-week summer academies thereafter, will also include themes that will help teachers implement program-specific aspects of Vision 21 at their particular schools, and further prepare all teachers for the increased skills necessitated by the State's proficiency testing requirements.

The estimated cost of this program over seven years is approximately $19 million as indicated below:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0 | 3.0 | 3.6 | 3.8 | 4.0 | 2.0 | 2.6 |

**8. Proficiency Test Performance Improvement Programs**

The proficiency testing improvement program will: (a) provide a summer tutorial program for all students who need additional assistance; (b) offer in-service training for teachers in the use of technology and create a central educational technology support service to assist teachers; (c) change the daily schedules at the senior high schools to reduce study halls and introduce learning approaches which make use of longer blocks of time; (d) hire up to 24 additional teachers for high schools particularly to prepare students to pass the proficiency tests concerning higher level mathematics and science courses; (e) offer peer tutoring programs in all high schools and middle schools; and (f) establish 34 proficiency test computer laboratories, one at each of the middle and high schools where they do not presently exist.

The estimated cost of these strategies is approximately $35 million over seven years as follows:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0 | 5.7 | 6.2 | 6.4 | 5.5 | 5.5 | 5.7 |

**9. Afri–Centrie/Multicultural Infusion Throughout The Curriculum, District-wide**

This component of Vision 21 involves three parts: the revision of the District's curriculum, the training of teachers and staff, and the creation of selected immersion programs with a particularly intensive Afri-centric thematic approach. Additional staff will be added to support the development and infusion of this material into all curricula. Specialized staff will also work with teachers in the use of these materials in regular classroom settings.

The estimated cost of this initiative over seven years is approximately $10 million as follows:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0.4 | 1.3 | 1.4 | 1.5 | 1.7 | 1.8 | 1.9 |

10. School Climate Improvement Projects

All 127 schools will have school climate improvement projects developed at the building level and designed to improve school climate. The program, which began this year, provides grants to schools to implement their own efforts to improve the learning climate and provide a safe and secure environment.

The estimated cost of this program over seven years is approximately $8 million as follows:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0.5 | 0.8 | 1.0 | 1.3 | 1.5 | 1.5 | 1.4 |

11. Improved Public Communication Programs

The District will implement an enhanced public communications function, including three parent communication centers which will assist parents in making informed choices about the options which are available to them. Awareness campaigns will be offered to explain the community model schools and their themes, the magnet school program and magnet offerings, and the other educational elements of Vision 21.

The cost of implementing this component over seven years is approximately $5 million as follows:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0.3 | 0.6 | 0.7 | 0.7 | 0.8 | 0.9 | 1.0 |

12. Additional Monitoring and Assessment

The District will add personnel and other resources to provide more effective assessment and monitoring of the Vision 21 programs and compliance with the Settlement Agreement. The estimated cost over seven years is approximately $2 million as follows:

| 1993–94 | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–2000 |
|---------|---------|---------|---------|---------|---------|-----------|
| 0 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 |

13. Improvement of Selected School Facilities

Selected capital improvements to school facilities will be made, particularly in geographic regions where student desegregation has historically been difficult to maintain, and at selected magnet and community model schools. These improvements will be guided by the interim and final strategic facilities plans which the Parties will establish.

The estimated costs of these improvements are yet to be determined.

APPENDIX E

## EXHIBIT 22

### DISTRICT SCHOOLS WITH RACIAL COMPOSITIONS (GRADES 1-12) FOR 1983-1994 DEVIATING MORE THAN 15 PERCENTAGE POINTS (PLUS OR MINUS) FROM DISTRICTWIDE RATIO

| October 1983 Schools | % Black | October 1984 Schools | % Black | October 1985 Schools | % Black | October 1986 Schools | % Black | October 1987 Schools | % Black | October 1988 Schools | % Black | October 1989 Schools | % Black |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cranwood | 87 | Cranwood | 89 | Clement | 85 | Clement | 89 | Cranwood | 88 | Clement | 88 | Collinwood | 86 |
| deSauze | 85 | deSauze | 86 | Cranwood | 90 | Corlett | 85 | deSauze | 90 | deSauze | 89 | Cranwood | 88 |
| Euclid Park | 92 | Euclid Park | 95 | deSauze | 88 | Cranwood | 93 | Euclid Park | 93 | Gracemount | 88 | deSauze | 88 |
| Fulton | 87 | Fulton | 88 | Euclid Park | 95 | Denison | 53 | Jane Addams | 92 | Health Careers | 87 | East | 85 |
| Hamilton | 89 | Jane Addams | 86 | Fulton | 90 | deSauze | 89 | John Adams | 88 | Iowa-Maple | 89 | Health Careers | 85 |
| Jane Addams | 87 | John Adams | 86 | Jane Addams | 88 | Euclid Park | 95 | John Kennedy | 86 | Jane Addams | 92 | Jane Addams | 91 |
| John Adams | 87 | John Kennedy | 86 | Stevenson | 90 | Fulton | 87 | Longfellow | 88 | John Kennedy | 87 | John Kennedy | 86 |
| Mitford | 44 | Stevenson | 88 | Valley View | 86 | Gracemount | 86 | Miles | 88 | Miles | 88 | Mound | 50 |
| Valley View | 89 | Valley View | 88 | Willow | 51 | Jane Addams | 89 | Mt. Pleasant | 86 | Wade Park | 89 | South | 53 |
| Willow | 48 | Willow | 49 | | | John Adams | 86 | Westropp | 87 | Westropp | 88 | Spellacy | 86 |
| | | | | | | John Kennedy | 86 | | | | | Woodland Hills | 87 |
| | | | | | | Longfellow | 85 | | | | | | |
| | | | | | | Miles | 91 | | | | | | |
| | | | | | | Westropp | 86 | | | | | | |
| | | | | | | Willow | 51 | | | | | | |

SOURCE: OSMCR Report, at V-1-8; OSMCR Second Supp. Report, at 72; District student enrollment data. Calculations exclude kindergarten students (except for elementary magnet schools) from school and District percentage Black enrollments and round off such percentages to nearest whole numbers. Districtwide ratio (Grades 1-12) was 69% Black, 1983 through 1986, 1989 and 1990; 70% Black in 1987 and 1988; and 69% from 1991 through the present. Identified schools exclude LAU sites which are schools serving specially assigned concentrations of limited-English minority students (e. g., Hispanics, Asian-Americans), and have traditionally been excluded from the ±15% criterion.

1582

| October 1990 | | October 1991 | | October 1992 | | October 1993 | | November 1994* | |
|---|---|---|---|---|---|---|---|---|---|
| Schools | % Black | Schools | % Black | Schools | % Black | Schools | % Black | Schools | % Black |
| Almira | 53 | Almira | 53 | Almira | 52 | Agassiz | 34 | Almira | 47 |
| Collinwood | 88 | Benesch | 87 | Benesch | 89 | Almira | 47 | Bolton | 86 |
| Corlett | 88 | Cleaveland | 94 | Bryant | 51 | Aviation | 53 | Bryant | 39 |
| Cranwood | 90 | Collinwood | 88 | Cleaveland | 94 | Benesch | 90 | Collinwood | 90 |
| Fulton | 85 | Cranwood | 89 | Collinwood | 88 | Bolton | 87 | deSauze | 87 |
| Jane Addams | 90 | East High | 88 | Corlett | 88 | Bryant | 46 | Dike Mont. | 88 |
| MacArthur | 37 | Jane Addams | 87 | East Clark | 88 | Cleaveland | 98 | Dunbar | 49 |
| Mound | 48 | Spellacy | 85 | East High | 86 | Clement | 89 | Fulton | 89 |
| Perry | 85 | Wade Park | 87 | Euclid Park | 52 | Collinwood | 91 | Garfield | 47 |
| Spellacy | 88 | | | Fullerton | 88 | Corlett | 93 | Gordon | 49 |
| Woodland Hills | 86 | | | Ireland | 48 | Cranwood | 99 | Gracemount | 90 |
| | | | | Jones | 87 | Dike Mont. | 92 | Harper | 51 |
| | | | | Raper | 52 | Dunbar | 51 | Harvey Rice | 93 |
| | | | | Riverside | 85 | East Clark | 98 | Ireland | 88 |
| | | | | Spellacy | 85 | East High | 89 | Marshall | 54 |
| | | | | Wade Park | 93 | Euclid Park | 91 | Pasteur | 90 |
| | | | | | | Garfield | 30 | Raper | 95 |
| | | | | | | Gordon | 51 | Standish | 93 |
| | | | | | | Gracemount | 89 | Ward | 39 |
| | | | | | | Hamilton | 88 | Wright | 53 |
| | | | | | | Harper | 51 | | |
| | | | | | | Harvey Rice | 91 | | |
| | | | | | | Hawthorne | 34 | | |
| | | | | | | Iowa-Maple | 97 | | |
| | | | | | | Ireland | 90 | | |
| | | | | | | John Kennedy | 96 | | |
| | | | | | | Longfellow | 87 | | |
| | | | | | | MacArthur | 39 | | |
| | | | | | | MLK Law | 86 | | |
| | | | | | | Morgan | 87 | | |
| | | | | | | Mt. Pleasant | 85 | | |
| | | | | | | Pasteur | 86 | | |
| | | | | | | Rickolf | 100 | | |
| | | | | | | Riverside | 33 | | |
| | | | | | | Shuler | 51 | | |
| | | | | | | Standish | 89 | | |
| | | | | | | Stevenson | 96 | | |
| | | | | | | Valley View | 29 | | |
| | | | | | | Wade Park | 95 | | |
| | | | | | | Ward | 34 | | |
| | | | | | | Wright | 53 | | |

This list excludes schools that are not required to meet the ±15% criterion for the 1994-95 school year under the Settlement Agreement. At the beginning of the 1994-95 school year, approximately 25 schools were included on this particular list, but, through efforts undertaken by the Local Defendants since the beginning of the school year, five of those schools (Hamilton, MacArthur, Mt. Pleasant, Shuler, and Valley View) were brought within the ±15% criterion and, thus, do not appear on this list

APPENDIX F

BP43000
43015.1
041996

## Cleveland City School District Racial Composition Data* for 1983-1991 and Present School Year (1995-1996)

| | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1995-96 |
|---|---|---|---|---|---|---|---|---|---|---|
| Districtwide percent African-American students | 69% | 69% | 69% | 69% | 70% | 70% | 70% | 69% | 69% | 71% |
| Number of African-American students in schools which are ≥ 90% African American | 545 | 565 | 1,473 | 1,263 | 1,200 | 558 | 532 | 644 | -0- | 14,033 |
| Percent of African-American students in schools which are ≥ 90% African-American | 1.11 | 1.18 | 3.09 | 2.67 | 2.51 | 1.18 | 1.17 | 1.45 | -0- | 29.34 |
| Percent of African-American students in schools which are ≥ 20% over Districtwide average of African-American | 2.27 | 1.70 | 3.09 | 4.45 | 2.51 | 1.18 | 1.17 | 1.45 | 1.14 | 27.29 |
| Number of secondary schools | 41 | 41 | 41 | 41 | 41 | 41 | 40 | 39 | 38 | 36 |
| Number of secondary schools which are > 90% African-American | -0 | -0- | -0- | -0- | 1 | 1 | 1 | 1 | -0- | 12 |
| Number of schools with ≥ 90% other | -0- | -0 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 0- |

* Grades 1-12, OSMCR calculations.
Source: October Periodic Status Reports., Specification 1a, tally of Student Assignments for 1995-96 excluding pre-Kindergarten and Kindergarten.